UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

DARRYL BRADSHAW,

Plaintiff,

v.

9:24-CV-1350
(DNH/ML)

RYAN ZEHR, Correction Sergeant; and
J. LEON, Correction Officer,

Defendants.

---

APPEARANCES: OF COUNSEL:

DARRYL BRADSHAW
*Pro Se* Plaintiff
Upstate Correctional Facility
Post Office Box 2001
Malone, New York 12953

LETITIA A. JAMES
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, New York 12224

ALEXANDRA GALUS, ESQ.
Assistant Attorney General

MIROSLAV LOVRIC, United States Magistrate Judge

## REPORT and RECOMMENDATION

Currently before the Court, in this civil rights action filed by Darryl Bradshaw ("Plaintiff") against Ryan Zehr and J. Leon (collectively "Defendants") is Defendants' motion for partial summary judgment (Dkt. No. 35). For the reasons set forth below, I recommend that Defendants' motion be denied.

# I. RELEVANT BACKGROUND

## A. Plaintiff's Claims

At this procedural posture, Plaintiff asserts claims of excessive force and failure to intervene against Defendants pursuant to the Eighth Amendment and 42 U.S.C. § 1983. (Dkt. Nos. 7, 8.)

## B. Parties' Briefing on Defendants' Motion for Partial Summary Judgment

Generally, in support of their motion for partial summary judgment, Defendants assert that Plaintiff's failure to intervene claims should be dismissed. (*See generally* Dkt. No. 35, Attach. 5.) More specifically, Defendants argue that Plaintiff alleges that they directly participated in the use of excessive force and thus, the failure to intervene claims are inapplicable and should be dismissed. (Dkt. No. 35, Attach. 5 at 5.) Defendants argue that in the alternative, Plaintiff should be required to identify which theory of liability he intends to proceed with against each Defendant at the time of trial. (*Id.* at 5-6.)

Plaintiff's response to Defendants' motion was due on or before April 6, 2026. (Dkt. No. 36.) On March 26, 2026, Plaintiff filed a letter request for an extension of time to respond to the motion for partial summary judgment. (Dkt. No. 37.) On March 27, 2026, the undersigned granted Plaintiff's letter request and extended the time for him to respond to the motion for partial summary judgment until April 20, 2026. (Dkt. No. 38.) On April 28, 2026, the undersigned *sua sponte* extended the deadline for Plaintiff to file a response to the motion for partial summary judgment until June 12, 2026. (Dkt. No. 39.)

To date, Plaintiff has not filed a response to the pending motion. (*See generally* docket sheet.)

**C. Defendants' Statement of Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported by Defendants in their Statement of Material Facts and not denied by Plaintiff in a response. (Dkt. No. 35, Attach. 2.)

1. Plaintiff is an incarcerated individual in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and is presently confined at Upstate Correctional Facility.

2. Plaintiff was housed at Auburn Correctional Facility ("Auburn C.F.") during the time relevant to the Amended Complaint.

3. On August 14, 2023, Plaintiff was housed at Auburn C.F. hospital on a contraband and mental health watch.

4. On the morning of August 14, 2023, Plaintiff threatened officers and smeared feces throughout his cell.

5. Due to Plaintiff's behavior, the CERT team was called to remove Plaintiff from his cell and do a routine cell search.

6. A probable cause strip frisk was performed on Plaintiff.

7. During the course of the strip frisk, force was used against Plaintiff.

8. During the use of force, Plaintiff was placed in mechanical restraints.

9. All force ceased after Plaintiff was placed in mechanical restraints.

10. Plaintiff alleges that both Defendants used excessive force on him and failed to intervene in the same incident.

## II. RELEVANT LEGAL STANDARDS

### A. Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[1] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-

---

[1] As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

movant is proceeding *pro se*.[2] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[3] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[4]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1. What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported

---

[2] *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[3] *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[4] *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[5]–even when the non-movant was proceeding *pro se*.[6]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[7] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

5 Among other things, Local Rule 56.1 (previously contained in Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1.

6 *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

7 *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

### B. Standard Governing a Failure to Intervene Claim

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter,* 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976).

Under the Eighth Amendment, prison officials are required to take reasonable measures to guarantee the safety of inmates and to protect them from known harm. *Farmer v. Brennan,* 511 U.S. 825, 832-33 (1970). Hence, allegations that an officer failed to intervene and prevent assaults are sufficient to state an Eighth Amendment failure to protect claim. *See Rogers v. Artus*, 13-CV-0021, 2013 WL 5175570, at *3 (W.D.N.Y. Sept. 11, 2013). "A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if '(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.'" *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010) (citations omitted).

## III. ANALYSIS

After carefully considering the matter, I recommend that Defendants' motion for partial summary judgment be denied.

Defendants may be held liable for excessive force or failing to intervene. *Franco v. City of Syracuse*, 16-CV-0634, 2019 WL 1410348, at *4 (N.D.N.Y. Mar. 28, 2019) (Scullin, J.) (citing *Buchy v. City of White Plains*, 14-CV-1806, 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015) (holding that the plaintiff "may hold Detective Kelly liable for one cause of action or the other"). Indeed, "[t]he Federal Rules of Civil Procedure recognize claims may be brought in the alternative, even if they are inconsistent." *Buchy*, 2015 WL 8207492, at *3 (citing Fed. R. Civ.

P. 8(d)(2), (3)). "Moreover, district courts have allowed excessive force and failure to intervene claims to proceed in the alternative beyond the summary judgment stage." *Franco*, 2019 WL 1410348, at *4 (citing *Buchy*, 2015 WL 8207492, at *3); *see Jones v. Buck*, 22-CV-1188, 2026 WL 2350153, at *9 (N.D.N.Y. Aug. 13, 2026) (Coombe, J.) (rejecting the defendants' argument that the failure to intervene claims should be dismissed because they cannot be liable both for using excessive force and for failing to intervene to prevent that use of excessive force); *Williams v. DiPuccio*, 19-CV-0995, 2024 WL 1765558, at *3-4 (N.D.N.Y. Apr. 24, 2024) (Sannes, C.J.) (rejecting the defendants' motion for partial summary judgment arguing that because the defendants were allegedly direct participants in the excessive force, they cannot be liable for failure to intervene and noting that "if there was an excessive use of force, a jury might find that only one of the Defendants' use of force was excessive."); *Cornell v. Vill. of Clayton*, 691 F. Supp. 3d 608, 621 (N.D.N.Y. 2023) (Hurd, J.) (declining to dismiss the plaintiff's failure to intervene claim based on the defendants' argument that they cannot be liable for both excessive force and failure to intervene).[8]

As a result, I recommend that Defendants' motion for partial summary judgment be denied.[9]

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Defendants' motion for partial summary judgment (Dkt. No. 35) be <u>**DENIED**</u>; and it is further

---

8 Defense counsel is reminded of her obligations under N.Y. R. Prof. Conduct 3.3(a)(2), which requires that she disclose to a tribunal controlling legal authority known to her to be directly adverse to the position of her client and not disclosed by opposing counsel.

9 To the extent that Defendants request that "Plaintiff . . . be required to identify which theory of liability he intends to proceed against each Defendant at the time of trial" they may present that argument at the appropriate time, should this case proceed to trial.

**ORDERED** that the Clerk of the Court shall file a copy of this Report and Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[10]

**NOTICE**: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[11] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: October 5, 2026
Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[10] The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[11] If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

# Beers v. GMC

United States District Court for the Northern District of New York

May 17, 1999, Decided ; May 17, 1999, Filed

97-CV-482 (NPM/DNH)

**Reporter**
1999 U.S. Dist. LEXIS 12285 *; 1999 WL 325378

MARK W. BEERS and JANET BEERS, Plaintiffs, -against- GENERAL MOTORS CORPORATION, Defendant.

**Disposition:** **[*1]** GM's motion to dismiss pursuant to *Fed. R. Civ. P. 37* GRANTED. Defendant's motion for summary judgment GRANTED in entirety.

**Counsel:** For Plaintiff: Diane V. Bruns, Esq., LoPinto, Schlather, Solomon & Salk, Ithaca, New York.

For Defendant: Timothy S. Coon, Esq., Eckert Seamans Cherin & Mellott, LLC, Pittsburgh, Pennsylvania.

For Defendant: Margaret J. Fowler, Esq., Chernin & Gold, LLP, Binghamton, New York.

**Judges:** Neal P. McCurn, Senior United States District Judge.

**Opinion by:** Neal P. McCurn

## Opinion

### MEMORANDUM-DECISION & ORDER

### INTRODUCTION

Defendant General Motors ("GM") moves for dismissal pursuant to *Federal Rule of Civil Procedure 37(b)(2)*, [1] **[*2]** or alternatively, for summary judgment. The motion for dismissal is based on plaintiff's loss of crucial evidence. Plaintiff opposes the sanction of dismissal, and argues in part that summary judgment is inappropriate. [2] For the reasons that follow, the court grants GM's motion to dismiss, or in the alternative, grants summary judgment.

### BACKGROUND

Plaintiff Mark Beers was injured in March of 1994 while working on a friend's 1984 GM pickup truck. The truck had a flexible engine cooling fan ("flex fan") installed to cool the engine. It is undisputed that this flex fan did not belong on the truck, and was installed by a third party. [3] At some point, while the engine was running, one of the flex fan blades broke

---

[1] *Fed. R. Civ. P. 37(b)(2)* states:

If a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: . . . (C) An order striking out pleadings or parts thereof . . . or dismissing the action or proceeding . . . or rendering a judgment by default against the disobedient party[.]

*Fed. R. Civ. P. 37(b)(2)*.

[2] Although GM moves for summary judgment on all of plaintiff's claims, including failure to warn, see Def. Mem. of Law at 18 n. 7, docket no. 48 and Def. Response at 6-8, docket no. 67, plaintiff fails to oppose summary judgment on the failure to warn claim.

[3] It appears the flex fan was from a 1974 GM truck. Trucks designed with flex fans had metal protective shrouds over the fans. The 1984 type of truck involved in plaintiff's injury was not designed to have a flex fan, and had a plastic protective shroud over the fan.

off, penetrated the plastic protective shroud, and struck plaintiff, injuring him.

**[*3]** Plaintiff retained legal counsel, and the flex fan assembly was obtained from the owner of the truck. Plaintiff's expert, Robert Wehe, then examined the flex fan assembly. See Wehe Dep. at 11. As part of the inspection, he disassembled the flex fan assembly, which irreparably altered it from its condition at the time of the accident. See GM's Supplemental Br. Ex. 1 at P 20, docket no. 62. Moreover, plaintiff's counsel never notified GM that the flex fan was to be taken apart, gave it the opportunity to be present, or allowed it to inspect the flex fan first. See id. at PP 21-22. No video or photos were taken at the time of disassembly. See id. at P 23. Although Wehe now claims the fan blade broke because of a design defect, he also noted the arm which held that blade was "severely bent." [4] **[*4]** Wehe Dep. at 11. Wehe recognized that this damage could have caused the blade to come off. [5] See id. at 79-80. In response to the present motion, Wehe now admits that he has misplaced most of the flex fan assembly, and that it is lost. See Wehe Aff. at P 3, docket no. 56.

Plaintiff brought suit against GM in the New York Supreme Court, Cortland County, on March 12, 1997. The action was removed to the United States District Court for the Northern District of New York on the basis of complete diversity.

The file and record in this case are replete with examples of discovery abuse by plaintiff. GM has sought to inspect the flex fan assembly for more than a year. On May 12, 1998, after application by GM, Magistrate Judge Hurd found that plaintiff failed to comply with the pretrial scheduling order (in part to supply the flex fan assembly for inspection), failed to respond in opposition, and failed to participate in a telephone conference with the court. He consequently granted GM permission **[*5]** to move before this court for dismissal under either *Federal Rule of Civil Procedure 37* or *56*. See Order of May 12, 1998, docket no. 14. GM then promptly moved for the same.

In opposition to the motion, plaintiff's counsel Diane Bruns filed an affidavit with this court averring that "the fan blades and housing are available for defendant's inspection, should the court [deny GM's motion and] grant plaintiffs' cross motion to reopen and extend the discovery period." Bruns Aff. of June 17, 1998 at P8, docket no. 22. Plaintiff's statement of material facts in opposition to this first motion stated that "the fan belt [sic] assembly, which was in the custody of plaintiffs' expert witness and in storage during his absence, and the housing are now available for defendant's inspection." Pl.'s Statement of Material Facts of June 17, 1998 at P6, docket no. 24. Finally, plaintiff's memorandum in opposition argued that the action should not be dismissed for discovery abuse because "plaintiffs . . . have provided . . . access to the fan blade assembly now that it has become possible to do so." [6]

---

[4] The possibility that the flex fan failed due to prior damage is a major reason GM moves for dismissal. GM's primary defense theory is that the fan was not defective, but failed because it had been previously damaged. GM argues it is unable to present such a defense because the flex fan, except for a few pieces, is now missing, and thus its expert is not capable of effectively rendering such an opinion.

[5] At a later portion of his deposition, Wehe maintained that he had ruled out the flex fan's failure due to the bent arm. See Wehe Dep. at 81-82. He was unable to explain, however, what basis he had for ruling out the same. See id. GM argues that because its expert has not examined the flex fan assembly, including the bent arm, he is unable to effectively refute Wehe.

[6] The reason plaintiff then claimed inability to comply with the discovery orders was an extended trip by Wehe. See Bruns Aff. of June 17, 1998 at P3. Wehe apparently had the flex fan assembly in storage during his trip. As GM then correctly pointed out, however, "there is no indication . . . that any attempt was made [by plaintiff's counsel] to contact Dr. Wehe during the period of his alleged 'unavailability[.]'" GM Reply of June 30, 1998 at 2, docket no. 27.

Pl.'s Mem. of Law of June 17, 1998 at 5, docket no. 25. On August 18, 1998, this court denied **[*6]** GM's motion and granted plaintiff's cross-motion to reopen and extend the discovery period because counsel represented that plaintiff was now willing to comply with discovery orders and turn over the flex fan assembly.

Following the court's denial of GM's first motion, plaintiff continuously failed to turn over the flex fan assembly, despite counsel's representations that she would do so. Consequently, on September 14, 1998, GM moved by order to show cause to compel discovery. Judge Hurd granted the order to show cause. See Order to Show Cause **[*7]** of September 17, 1998, docket no. 35. GM then withdrew the motion to compel when it appeared plaintiff would finally turn over the flex fan assembly. See Coon Letter to Judge Hurd of September 23, 1998, docket no. 37. Plaintiff's cooperation, however, proved short-lived. GM again moved for orders to show cause and compel before Judge Hurd on October 7, 1998. Judge Hurd granted the order to show cause on the same date. See Order to Show Cause of October 7, 1998, docket no. 39. In opposition to the motion to compel, plaintiff's counsel admitted that "defendant's counsel is correct in stating that the complete fan assembly has not yet been provided to defendant's expert." Rather, she stated that Wehe "has moved twice and placed many of his records and files in storage." Thus, although some fan blades had been sent to GM, Wehe had yet to locate the remainder of the fan assembly. See Bruns Aff. of October 7, 1998 at P3-4, docket no. 40.

On October 26, 1998, Judge Hurd granted the motion to compel, and specifically ordered plaintiff to turn over the flex fan assembly for inspection. ("Plaintiffs shall produce the complete engine cooling fan to the attorneys for the defendant **[*8]** on or before November 6, 1998. Failure to produce shall entitle defendant to make a dispositive motion or preclusion motion to the District Judge."). Order of October 26, 1998, docket no. 42. GM then moved for leave to file a summary judgment motion on the merits of the case on November 3, 1998. On the same day, this court denied the motion without prejudice to renew. Moreover, it stated that "the parties are hereby ORDERED to comply in all respects with the aforementioned order of Magistrate Judge Hurd." Order of November 3, 1998, docket no. 44. Plaintiff, as of present, has yet to turn over the flex fan assembly. Pursuant to this court's Order of November 3, 1998, and Judge Hurd's Order of October 26, 1998, GM filed the present motion to dismiss, or alternatively moves for summary judgment. In opposition to this present motion, plaintiff finally admits that the remainder of the flex fan assembly has been lost, and can not be found. See Bruns Aff. of February 1, 1999 at P 4, docket no. 55.

After motion papers were filed, the United States Court of Appeals for the Second Circuit decided the case of *West v. Goodyear Tire and Rubber Co., 167 F.3d 776 (2d Cir. 1999)*, **[*9]** which pertained to spoliation of evidence and the propriety of dismissal as a sanction pursuant to *Federal Rule of Civil Procedure 37*. The court then directed the parties to file supplemental briefs discussing this new case and *Rule 37*, as each related to dismissal for spoliation of evidence.

Oral argument was held in Syracuse, New York on March 24, 1999. There, the court questioned plaintiff's counsel to determine what fault, if any, plaintiff bore for the loss of the flex fan assembly. While the court reserved decision on the motions for dismissal or summary judgment, it did make a finding of fact that counsel and Wehe had been, at minimum, negligent in failing to preserve the crucial evidence.

Aside from arguments as to spoliation of evidence, plaintiff also raised a new theory of liability. [7] Defendant argued that plaintiff should not be permitted to assert a new claim so late in case and only in response to summary judgment.

**[*10]** The court noted that discovery and motions were closed, and that it would not allow plaintiff to amend the complaint. The court did, however, instruct plaintiff to file a statement setting forth his new claim, with any references in the record supporting its existence, within seven days. Thereafter, defendant was ordered to file its opposition within ten days. Finally, the court ordered plaintiff to file a reply within an additional ten days. [8]

For the reasons that follow, GM's motion to dismiss under *Rule 37* is granted. Alternatively, the court grants summary judgment for defendant.

## DISCUSSION

### I. Dismissal

GM argues that this matter should be dismissed as a sanction for spoliation of evidence. Spoliation of evidence, as recently defined by the Second Circuit, consists of "the destruction or significant alteration of evidence, **[*11]** or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West, 167 F.3d at 779* (citation omitted). A federal court may impose sanctions upon a party who engages in spoliation in derogation of court order. See *Fed. R. Civ. P. 37(b)(2)*; *West, 167 F.3d at 779*; *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988)*. Even in the absence of a discovery order, the court "may impose sanctions for spoliation, exercising its inherent power to control litigation." *West, 167 F.3d at 779*; accord *Chambers v. NASCO, Inc., 501 U.S. 32, 43-45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)*; *Sassower v. Field, 973 F.2d 75, 80-81 (2d Cir. 1992)*, cert. denied, *507 U.S. 1043, 113 S. Ct. 1879, 123 L. Ed. 2d 497 (1993)*.

Sanctions for spoliation, including dismissal, are reviewed by the Circuit for abuse of discretion. See *West, 167 F.3d at 779* (citing *Complaint of Consolidation Coal Co., 123 F.3d 126, 131 (3d Cir. 1997)*, cert. denied, *523 U.S. 1054, 118 S. Ct. 1380, 140 L. Ed. 2d 526 (1998)*); **[*12]** *Sieck v. Russo, 869 F.2d 131, 134 (2d Cir. 1989)*. The Circuit "will reject the district court's factual findings in support of its imposition of sanctions only if they are clearly erroneous." *West, 167 F.3d at 779* (citing *Friends of Animals, Inc. v. United States Surgical Corp., 131 F.3d 332, 334 (2d Cir. 1997)* (per curiam)).

The district court possesses "broad discretion in crafting a proper sanction for spoliation" but such sanction is to "serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." Id. This sanction is fashioned to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in

---

7

"Although the 1984 Chevrolet pick-up was designed with a [safer] clutch fan as original equipment, it was also designed in such a way that the clutch fan could be readily and easily replaced with the more dangerous flex fan, resulting in the hazardous combination of a flex fan with an insufficiently protective plastic shroud, and no warnings concerning the hazards."

Pl.'s Statement of Design Defect at 2, docket no. 66.

8 Plaintiff filed his statement of the new theory and defendant responded in opposition. Plaintiff, however, then failed to file a reply as directed by the court.

absent the wrongful destruction of evidence by the opposing party.'" Id. (quoting *Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998))*.

"'Outright dismissal of a lawsuit . . . is within the court's discretion.'" Id. (quoting *Chambers, 501 U.S. at 45*); see also *Fed. R. Civ. P. 37(b)(2)(C)*. Dismissal **[*13]** is proper if there is "a showing of willfulness, bad faith, or fault on the part of the sanctioned party." *West, 167 F.3d at 779* (citing *Jones v. NFTA, 836 F.2d 731, 734 (2d Cir. 1987))*. Contrary to plaintiff's arguments, dismissal is not limited only to matters where the offending party has acted with bad faith or willful intent, but is permitted where there is *any* fault of the sanctioned party. See *Bobal v. Rensselaer Polytechnic Institute, 916 F.2d 759, 764 (2d Cir. 1990)*. Plaintiff argues that "the court should consider less drastic measures[.]… where there is no evidence of bad faith causing the loss of the evidence, because two of the most important rationales underlying *Rule 37* sanctions are to punish an offending party, and to deter others from acting similarly." Pl.'s Supplemental Brief at 5 (emphasis supplied). Yet, it has been noted that negligent wrongs, like intentional wrongs, are proper subjects for general deterrence. See *Penthouse Int'l, Ltd. v. Playboy Enters., Inc., 663 F.2d 371, 387 (2d Cir. 1981)* (citing G. Calabresi, The Cost of Accidents, 133-173 (1970)). Not only have negligent **[*14]** wrongs been found proper subjects for deterrence, but federal courts have dismissed under *Rule 37* as punishment for negligence. See *Thiele v. Oddy's Auto and Marine Inc., 906 F. Supp. 158, 162-63 (W.D.N.Y. 1995)* (evidence negligently lost by plaintiff necessitated dismissal under *Fed. R. Civ. P. 37*); *Brancaccio v. Mitsubishi Motors Co., Inc., 1992 U.S. Dist. LEXIS 11022, 1992 WL 189937*, at *2 (S.D.N.Y. 1992) (plaintiff's negligent loss of the defective product, after her expert had examined it, but where defendant had not, necessitated dismissal under *Rule 37*). [9] Hence, even under plaintiff's own interpretation of the purposes of *Rule 37*, quoted above, it is quite clear that courts regard the type of spoliation undertaken by plaintiff as cause for dismissal.

**[*15]** Plaintiff should be held responsible for both his expert's loss of the crucial evidence, and his counsel's defiance of court orders. This is the type of fault required for dismissal under *Rule 37*; although there has been no allegation that Wehe intentionally discarded the flex fan assembly, as an expert retained to examine the actual defective part, he was grossly negligent in permanently altering, and then even worse, losing the very item this lawsuit is over. "Gross professional incompetence no less than deliberate tactical intransigence may be responsible for the interminable delays and costs that plague modern complex lawsuits." *Penthouse, 663 F.2d at 387*.

Aside from Wehe's loss of the crucial

---

[9] New York State courts also dismiss for negligent spoliation. See *Squitieri v. City of New York, 248 A.D.2d 201, 202-03, 669 N.Y.S.2d 589, 590* (1st Dep't 1998) ("Spoliation sanctions such as [dismissal] are not limited to cases where the evidence was destroyed willfully or in bad faith, since a party's negligent loss of evidence can be just as fatal to the other party's ability to present a defense[.]" [citation omitted]); *Kirkland v. New York City Housing Auth., 236 A.D.2d 170, 174-75, 666 N.Y.S.2d 609* (1st Dep't 1997) (noting that numerous federal and state courts "have found dismissal warranted when discovery orders were not violated, and even when the evidence was destroyed prior to the action being filed . . . notwithstanding that the destruction was not malicious . . . or in bad faith[.]" [citations omitted]); *Mudge, Rose, Guthrie, Alexander & Ferdon v. Penguin Air Conditioning Corp., 221 A.D.2d 243, 243, 633 N.Y.S.2d 493* (1st Dep't 1995) ("Dismissal of the amended complaint is also warranted because of plaintiff's *negligent loss of a key piece of evidence which defendants never had an opportunity to examine*[.]" [citation omitted]) (emphasis supplied). While this federal court is bound to vindicate the Federal Rules of Civil Procedure, it surely would be an anomaly if plaintiff was permitted to negligently spoliate evidence and have his case survive in a federal diversity action, but have his claim dismissed if the action was in state court.

evidence, counsel bears fault for disobeying several orders of both Magistrate Judge Hurd and this court in failing to provide the flex fan assembly, and wasting the scant judicial resources of the court in assuring plaintiff's compliance with mandatory discovery. Until this present motion, counsel never notified the court of her inability to comply with the court's orders, instead engaging in a pattern of delay and avoidance, perhaps waiting for Wehe to return from his **[*16]** trip, and then hoping Wehe would rediscover the missing evidence. The district court possesses the discretion to dismiss for disobedience of discovery orders. See *Sieck, 869 F.2d at 134* (we . . . prefer to . . . provide the teeth to enforce discovery orders by leaving it to the district court to determine which sanction from among the available range is appropriate.").

Counsel not only bears fault for disobeying court orders, but responsibility for carefully supervising the expert retained. The fact that plaintiff or counsel themselves did not personally lose the evidence is irrelevant. With full knowledge of the pretrial discovery order, and deadlines to turn over evidence, including the flex fan assembly, counsel continued to retain Wehe despite his trip, and let him keep the very items required to be turned over, which were inaccessible while he was on his trip (and ultimately lost). Even after Wehe returned, despite numerous representations to the court that the complete flex fan assembly would be turned over to defendant, it never was.

Finally, plaintiff sometimes must suffer for the faults of his lawyers and experts, especially when their acts are extremely **[*17]** prejudicial to the opposing party, who otherwise has no effective remedy. See *Link v. Wabash R.R. Co., 370 U.S. 626, 633-34, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962)* (client freely selected attorney and is bound by acts of lawyer-agent); see also James Wm. Moore, *Moore's Federal Practice § 37.50[2][b]*, at 37-83, and 37-83 n. 42.2 ("the Supreme Court has rejected the notion that dismissal of a plaintiff's complaint because of counsel's unexcused conduct imposes unjust penalty on the client.").

Dismissal is a drastic remedy and should be imposed only after consideration of alternative, less drastic sanctions. See *West, 167 F.3d at 779*. [10] The Second Circuit has also directed, however, that in fashioning a sanction, the district court must take into account the ability of the sanction to "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." Id. As GM's defense revolves around pre-accident damage to the very item missing, it will be unable to effectively show that the fan blade broke for reasons other than a defect. A lesser sanction is thus inappropriate **[*18]** as it does not cure the prejudice to GM. [11]

## A. Distinction Between *West* and the Present Case

Plaintiff argues that this case is similar to West, and consequently should not be dismissed. In West, the district court dismissed pursuant to *Rule 37* after plaintiff spoliated certain evidence which prejudiced defendants. See *West v. Goodyear Tire and Rubber Co., 1998 U.S. Dist. LEXIS 1529, 1998 WL 60942 (S.D.N.Y. 1998)*. The Second Circuit reversed, *167 F.3d 776*, holding that other, less severe **[*19]** sanctions than dismissal should have been utilized. West is clearly

---

[10] Another circuit has noted that the district court should not be required "to incant a litany of the available lesser sanctions[.]" *Harmon v. CSX Transp., Inc., 110 F.3d 364, 368 (6th Cir. 1997)*.

[11] Alternatively, if lesser sanctions were imposed, such as evidence preclusion, there is a strong possibility of summary judgment in GM's favor due to plaintiff's inability to make out a prima facie case without evidence of the flex fan or pertinent portions of his expert's testimony.

distinguishable.

The West plaintiff was injured when a tire he was mounting exploded. Plaintiff had already mounted an identical tire (the "exemplar wheel") which had not exploded. Defendants' theory of defense was that plaintiff grossly overinflated both tires, and the second tire exploded. They planned to show the overinflation by introducing evidence of the overinflated but unexploded exemplar wheel. The exemplar wheel, however, was sent by plaintiff to a lawyer specializing in tire explosion cases. Fearing the tire would explode, that lawyer ordered it deflated. As the Circuit noted, "defendants believe that by deflating the exemplar wheel, West's lawyers deflated their case." *West, 167 F.3d at 780*.

Furthermore, defendants planned to introduce the tire mounting machine and air compressor as circumstantial evidence that the exploded tire was overinflated. As the Circuit itself observed, "the compressor was set at an astronomical pressure of 160 pounds per square inch." *Id. at 778*. Though defendants requested inspection of the compressor and tire mounting machine, and an **[*20]** inspection was scheduled, plaintiff sold the devices before inspection occurred. See id. The devices were later located, but by then had been left outside and their conditions had deteriorated. See id. While defendants' experts were able to examine the devices, and opined that the devices could have malfunctioned and caused overinflation, "because West sold these items and the purchaser left them outside over the winter, defendant's experts had no way to determine the condition of the machines when they were in West's shop at the time of the accident." *Id. at 780*.

Based upon the spoliation of the exemplar wheel, compressor and tire mounting machine, the district court held defendants had been severely prejudiced, and dismissed the case pursuant to *Rule 37*. Reversing, the Circuit held that other less drastic sanctions were available to the district court which would have eliminated the prejudice to defendants without disposing of the case, such as evidence preclusion and inference charges. See *West, 167 F.3d at 780*.

The present matter is entirely different. Most importantly, the missing or spoliated item, unlike in West, is not circumstantial **[*21]** evidence, but the actual part that failed. There can be no adequate lesser sanctions, as they would be tantamount to summary judgment against plaintiff. Cf. *Pesce v. General Motors Corp., 939 F. Supp. 160, 165 (N.D.N.Y. 1996)* (Hurd, M.J.) ("the drastic sanction of preclusion [as to the missing defective item] would be tantamount to dismissal of the action."). Although in a defective design case lesser sanctions may not always prevent the claim, both federal and New York State courts have dismissed defective design cases as a result of plaintiff's spoliation, even where the spoliation occurred negligently. [12]

**[*22]** Even if the court did impose lesser sanctions, they would not likely remedy the wrong GM has suffered. Not only does GM argue that the flex fan was damaged, precipitating its failure, but GM sought inspection of the flex fan assembly to develop other defenses. As GM never examined the complete flex fan assembly, it does not even know what sanctions it wants the court to

[12] A defective design claim arguably does not require evidence of the product which actually failed, since all of the same type of product are uniformly defective. However, courts have dismissed for spoliation, even where plaintiff alleged a design defect. See *Brancaccio, 1992 WL 189937*, at *2 (case dismissed for spoliation under *Rule 37* where claim of improper seat belt design was present, when seat belt --and vehicle-- were disposed of through plaintiff's negligence); *Squitieri v. City of New York, 248 A.D.2d 201, 202, 669 N.Y.S.2d 589, 590* (1st Dep't 1998) (dismissal of third party complaint alleging defective design for loss of the defective product).

impose because it will never know of other defenses an inspection may have revealed. See GM Supplemental Brief at 6-7, 10-11.

In West, the Circuit Court also observed that the exemplar wheel was allegedly deflated as a purported public safety measure, which was a mitigating factor in the spoliation. There are no mitigating factors in the present matter. Plaintiff's expert lost the crucial evidence in this case. There is no excuse for such conduct, nor has plaintiff attempted to argue such. Furthermore, plaintiff's counsel has utterly failed to explain any efforts on her part to mitigate her failure to comply with the court's orders.

Another notable distinction between West and the present case is the type of remedy defendants sought as a sanction for spoliation. In West, only one of two defendants **[*23]** moved to dismiss. The other defendant moved only for lesser sanctions. This made clear that alternatives were available other than dismissal. [13] The circumstances here are different: GM, the sole defendant, moves for dismissal and argues that no other sanction will remove the prejudice plaintiff's spoliation has caused. The court agrees.

Finally, as a last distinction, the district court in West relied only on plaintiff's spoliation for dismissal. In this matter, **[*24]** the court relies not only upon the spoliation, but counsel's noncompliance with orders of both a Magistrate Judge and a District Judge. Not only does this court have the discretion under *Rule 37* to order dismissal for a plaintiff's noncompliance, see *Fed. R. Civ. P. 37*, but as the Supreme Court has recognized, the district court has the inherent power to regulate and control litigation before it. See *Chambers, 501 U.S. at 43-45*. If parties were allowed to disregard mandatory discovery deadlines and orders of the court, orderly and timely adjudication of cases would be subverted.

In summary, West can be distinguished, and the result will not be followed here for several reasons: (1) the evidence spoliated is not circumstantial; (2) due to the nature of the spoliated evidence, effective lesser sanctions may well be tantamount to summary judgment; (3) lesser sanctions may not remedy GM's prejudice because it does not know exactly what a physical inspection of the flex fan would have revealed as a potential defense; (4) no mitigating factors to the spoliation are present; (5) defendant herein actually moves for dismissal and argues only dismissal will protect **[*25]** its interests adequately; (6) plaintiff's counsel's disregard of discovery and other orders of the court support dismissal as a sanction under *Rule 37* and under the court's inherent power to control litigation before it.

Having carefully examined and considered the alternatives, no other remedy than dismissal appears appropriate. Only dismissal serves the three prongs the West panel enumerated as to the purposes of *Rule 37* and spoliation. [14] First, it will serve as a deterrent to plaintiff's counsel, his expert and non-parties from engaging in spoliation and disobedience of court orders. Second, the risk of an erroneous judgment will be on the party to lose the critical

---

[13] As the Circuit stated, "it is noteworthy that Goodyear did not move for dismissal as a sanction for spoliation; it only sought to have evidence relating to the spoliated materials excluded at trial. Only [the second defendant] moved to dismiss the complaint on the ground of spoliation. *Obviously, Goodyear believed that lesser sanctions, like exclusion of spoliated evidence, would protect its interests, although Goodyear would now benefit from the district court's dismissal*." *West, 167 F.3d at 780 n. 1* (emphasis supplied).

[14] "(1) Deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West, 167 F.3d at 779* (internal quotations and citation omitted).

evidence. Third, it appears no other sanction will restore GM to the position it would have been in absent the spoliation.

**[*26]** Accordingly, GM's motion for dismissal is granted. Moreover, as set forth below, the court alternatively grants GM's summary judgment motion.

## II. Summary Judgment

Even if the court did not impose lesser sanctions (which it would if it were not dismissing the case) plaintiff's claims fail as a matter of New York law. [15]

Plaintiff's defective design claims are barred by the subsequent modification doctrine of *Robinson v. Reed-Prentice Div. of Package Mach. Co., 49 N.Y.2d 471, 475, 426 N.Y.S.2d 717, 403 N.E.2d 440 (1980)*. As the New York Court of Appeals recently reiterated, "a manufacturer is not responsible for injuries **[*27]** resulting from substantial alterations or modifications of a product by a third party that render the product defective or otherwise unsafe." *Liriano v. Hobart Corp., 92 N.Y.2d 232, 236, 677 N.Y.S.2d 764, 765, 700 N.E.2d 303 (1998)* (citing Robinson).

This present matter is analogous to a recent Appellate Division, Third Department case upholding the subsequent modification doctrine under similar facts. See *Colonial Indem. Ins. Co. v. NYNEX, 260 A.D.2d 833, 688 N.Y.S.2d 744, 1999 WL 216867*, *2 (3d Dep't 1999). There, the Appellate Division granted summary judgment to defendant manufacturer because the undisputed cause of the damages was a part added by a third party subsequent to the product's manufacture. See id. at *1-2.

In the case at bar, as in Colonial Indemnity, plaintiff seeks to hold the manufacturer, GM, liable for the failure of a part which was added to the truck by a third party subsequent to the truck's manufacture and sale. Despite GM's assertion that New York law mandates summary judgment on these claims, plaintiff fails to oppose this argument in his opposition papers. [16] The court **[*28]** agrees that the subsequent modification doctrine of Robinson requires the claims to be dismissed. Moreover, plaintiff's failure to oppose GM's argument is deemed by the court as consent to summary judgment on these claims.

**[*29]** Plaintiff also alleges a failure to warn claim in his complaint, and reiterated the same at oral argument. Plaintiff otherwise fails to mention or support his allegation of failure to warn. In its motion for summary judgment, GM argues that "there is no record evidence to

---

[15] In a diversity action, the court must apply the substantive law of New York. See *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)*; *Caiazzo v. Volkswagenwerk A.G., 647 F.2d 241, 243 (2d Cir. 1981)*; *Paul Revere Life Ins. Co. v. Adelman, 1997 U.S. Dist. LEXIS 19804, 1997 WL 773706 (N.D.N.Y. 1997)* (Munson, S.J.).

[16] Plaintiff's sole opposition to summary judgment on his defective design claims is the assertion of the "new" theory of liability, mainly that the truck was defectively designed when it left GM's hands, as it was designed to allow the less safe flex fan to be installed. It is too late for plaintiff to assert this new theory, especially when his purpose is plainly to avoid summary judgment due to the subsequent modification doctrine. To determine whether the claim was indeed new, or had been present all along, as maintained by plaintiff, the court directed plaintiff to file a statement describing this new theory, supplemented with references to the record supporting its previous existence. Contrary to his assertions, none of the citations plaintiff points to disclosed or set forth this new theory. As discovery and motions are closed, the court declines to permit the new liability theory on either defective design or failure to warn.

Notwithstanding the untimeliness of plaintiff's new theory, the court notes and adopts GM's argument that plaintiff's novel theory still has, "at its heart, the issue of whether the flex fan was defective and at the root of that issue lies the question of the cause of the failure; a question that GM cannot adequately defend due to plaintiffs' negligent loss of the fan." Def. Reply at 4 n. 2, docket no. 59. Accordingly, even if the court allowed plaintiff's new theory, it does not alter the court's conclusion that this case must be dismissed for spoliation.

establish that a warning would have prevented this action, to whom a warning should have been given, the content of the warning, and all the other elements necessary to prove this type of claim." Def. Mem. of Law at 18 n. 7, docket no. 48. Plaintiff never responded to or refuted this argument in his opposition papers. After the court ordered supplemental briefing at oral argument, GM again argued the failure to warn claim was unviable. "Plaintiff[] here can point to no evidence or expert opinion in the record that the 1984 truck was defective because it lacked appropriate warnings. In contrast, the record shows that GM did provide information about the proper cooling fan to use on this truck." Def. Response at 8 n. 4, docket no. 67. Despite the court's order at oral argument for plaintiff to reply to GM's Response, plaintiff again not only failed to address GM's argument, but failed to file the reply at all. Thus, **[*30]** plaintiff has never opposed GM's argument for summary judgment on this claim.

This court has dismissed failure to warn claims when plaintiff fails to support the claim at a summary judgment motion. See *June v. Lift-A-Loft Equip., Inc., 1992 U.S. Dist. LEXIS 10064, 1992 WL 168181*, *2-3 (N.D.N.Y. 1992) (McCurn, C.J.). As with the present case, the June plaintiff left the "record[] devoid of any factual basis for concluding that the [product] carried inadequate warnings" and the court therefore granted summary judgment to defendant. Id. at *3. The same result is required here.

Additionally, Local Rule 7.1(b)(3) states that "failure to file or serve any papers as required by this rule shall be deemed by the court as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y. L.R. 7.1(b)(3). Plaintiff fails to oppose summary judgment on the warning claim although GM specifically argues it is entitled to such. Not only does plaintiff fail to address GM's argument in his opposition papers, but he failed to file a reply addressing similar arguments after the court directed him to file the same. The court considers plaintiff's failures to oppose **[*31]** as consent to GM's motion for summary judgment on the failure to warn claim.

## CONCLUSION

For the aforementioned reasons, GM's motion to dismiss pursuant to *Fed. R. Civ. P. 37* is GRANTED. Dismissal is granted (a) due to plaintiff's spoliation of the crucial evidence under *Rule 37*; (b) due to counsel's noncompliance with orders of the court, pursuant to *Rule 37*; and (c) under the inherent authority of the court to control litigation before it. Alternatively, defendant's motion for summary judgment is GRANTED in the entirety.

IT IS SO ORDERED.

Dated: May 17, 1999

Syracuse, New York

Neal P. McCurn

Senior United States District Judge

**JUDGMENT IN A CIVIL CASE** - FILED MAY 18 1999

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED: GM's motion to dismiss is GRANTED. Defendant's motion for summary judgment is GRANTED in the entirety.

May 18, 1999

**DATE**

---

End of Document

2015 WL 8207492
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

David BUCHY, Plaintiff,
v.
The CITY OF WHITE PLAINS; Det. John Del Vecchio; and P.O. Ralph Marcallo, Individually and in Their Official Capacities, Defendants.

14 CV 1806 (VB)
|
Signed 12/07/2015

**Attorneys and Law Firms**

Rose Minna Weber, Rose M. Weber Law Office, New York, NY, for Plaintiff.

Joanna Marie Topping, Katrine Aliha Beck, Peter Alexander Meisels, Wilson Elser,Moskowitz Edelman & Dicker LLP, White Plains, NY, John Martin Flannery, Wilson Elser Moskowitz Edelman & Dicker LLP, Stamford, CT, for Defendants.

## OPINION AND ORDER

Briccetti, United States District Judge

***1** Plaintiff David Buchy brings this action under 42 U.S.C. § 1983 against Detectives John Del Vecchio and Rafael Maracallo (i/s/h/a "P.O. Ralph Marcallo") of the White Plains Police Department, alleging defendants beat him when they arrested him in his home. Against each defendant, plaintiff brings excessive force claims for violation of his Fourth Amendment rights, as well as claims for failure to intervene to prevent the use of excessive force. [1]

Before the Court is defendants' motion for partial summary judgment, solely on the failure to intervene claims. (Docs. ##45, 50). For the following reasons, the motion is GRANTED as to defendant Del Vecchio but DENIED as to defendant Maracallo.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

The parties have submitted briefs, statements of facts, and affirmations with supporting exhibits, which reflect the following factual background.

On the morning of September 5, 2012, both defendants came to plaintiff's apartment in Yonkers to arrest him. Plaintiff claims when he opened the door, Det. Del Vecchio immediately rushed into his apartment and grabbed his neck, shoulder, and wrist, while Det. Maracallo grabbed his arms and wrists. Plaintiff put on a shirt and shoes, and walked with defendants into the hallway. There, plaintiff alleges, Del Vecchio punched him several times in the head, and Maracallo began punching and kicking him as well. At some point, plaintiff fell to the floor, and both defendants punched and kicked plaintiff for approximately two minutes, while repeatedly shouting at him to stop resisting arrest. Plaintiff claims he was not resisting arrest and neither defendant was trying to handcuff him during this time.

Both defendants claim they were trying to handcuff plaintiff, but he resisted. During the ensuing physical struggle, defendants claim they and plaintiff all ended up on the ground. Neither defendant admits to punching or kicking plaintiff.

Plaintiff brought this case against defendants, alleging they both violated his Fourth Amendment rights by using excessive force to arrest him. Additionally, plaintiff brings a claim against each defendant for failure to intervene to prevent the use of excessive force.

Defendants move for partial summary judgment solely on the failure to intervene claims.

Defendants' argument is as follows: A law enforcement officer who uses excessive force cannot also be held liable for failure to intervene to prevent his own use of excessive force, because the failure to intervene claim merges with the excessive force claim; here, because plaintiff claims both officers used excessive force against him, neither officer can also be held liable for failure to intervene. Also, to the extent Del Vecchio's contact with plaintiff immediately after plaintiff opened the apartment door constituted excessive force, defendants argue Maracallo had no reasonable opportunity to prevent it because it happened too quickly.

***2** Plaintiff concedes "defendant Del Vecchio's direct involvement in the incident precludes a claim against him for failure to intervene." (Plaintiff's Br. at 1 n.1). As to defendant Maracallo, however, plaintiff responds by saying a reasonable jury, after hearing the evidence, could conclude "defendant Del Vecchio beat plaintiff up while defendant Maracallo did nothing to stop him." (Id. at 3).

Defendants respond that no party or witness maintains Det. Maracallo did nothing while Det. Del Vecchio alone used excessive force. In fact, defendants argue, all three participants in the arrest claim Maracallo was physically involved. Accordingly, the possibility a jury may find Maracallo "stood by and watched" is mere speculation, and summary judgment is appropriate. (Defendants' Reply Br. at 3).

## DISCUSSION

I. Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See id. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II. Failure to Intervene Claim Against Maracallo

***3** Summary judgment on the failure to intervene claim against Det. Maracallo is not warranted.

To establish a claim for failure to intervene, a plaintiff must show (i) the officer's failure "permitted fellow officers to violate [plaintiff's] clearly established statutory or constitutional rights," and (ii) it was "objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997) (internal quotation marks and citations omitted). The use of force must also have been "of a sufficient duration" to afford the officer a "reasonable opportunity" to intervene. Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 513 (S.D.N.Y. 2008).

When a law enforcement officer "is a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is inapplicable." Cuellar v. Love, 2014 WL 1486458, at *8 (S.D.N.Y. Apr. 11, 2014). Therefore, Maracallo may not be held liable both for using excessive force and for failing to prevent the use of excessive force.

Plaintiff may, however, hold Det. Maracallo liable for one or the other. The Federal Rules of Civil Procedure recognize claims may be brought in the alternative, even if they are inconsistent. See Fed. R. Civ. P. 8(d)(2), (3). At least one other court in this District has allowed excessive force and failure to intervene claims to proceed in the alternative beyond the summary judgment stage. See Cumberbatch v. Port Auth. of N.Y. and N.J., 2006 WL 3543670, at *11 (S.D.N.Y. Dec. 5, 2006) ("The Court will thus construe these claims as pleading in the alternative ... i.e., the Officers either used excessive force, or one or both of them failed to intervene while another officer used excessive force.").

The Court will allow the failure to intervene claim against Maracallo as an alternative to the excessive force claim. A reasonable jury could find Maracallo did not use excessive force against plaintiff, but failed to prevent defendant Del Vecchio from doing so.

Plaintiff's testimony, if credited, establishes the following facts: (i) Det. Del Vecchio punched and kicked plaintiff for approximately two minutes; (ii) Det. Maracallo was present the entire time and did not stop Del Vecchio; (iii) plaintiff was not resisting arrest. From these facts, a reasonable jury could conclude Maracallo should have perceived Del Vecchio's use of force was excessive and Maracallo had the opportunity to stop Del Vecchio, yet he allowed it to continue. All the elements of a failure to intervene claim would be met.

Defendants' argument, that summary judgment is appropriate because no single witness gives this exact version of events, is unpersuasive. A jury is free to believe all, some, or none of a plaintiff's testimony—indeed, a plaintiff's ability to bring claims in the alternative presupposes this. In this case, for example, a reasonable jury could listen to plaintiff's account of the incident and believe Del Vecchio punched and kicked him but not believe Maracallo joined in. Likewise, a reasonable jury could listen to the witnesses' descriptions of the arrest and find, although both defendants used some degree of force against plaintiff, only Del Vecchio's use of force was excessive.

***4** Defendants also argue there is no evidence Det. Maracallo merely watched as Det. Del Vecchio used excessive force because plaintiff and defendants all agree Maracallo was physically involved in the arrest. This is similarly unpersuasive. Maracallo need not have been standing away from plaintiff and Del Vecchio to observe the latter using excessive force. A reasonable jury could find Maracallo was physically involved in the arrest, saw Del Vecchio use excessive force, and failed to stop him, but did not use it himself.

The Court finds there is a question of fact as to whether Det. Maracallo failed to intervene during the time plaintiff alleges he was punched and kicked for two minutes. This is sufficient for the Court to allow the failure to intervene claim to proceed. Therefore, the Court need not consider defendants' argument that Maracallo had no opportunity to intervene when Del Vecchio first entered the apartment and grabbed plaintiff.

III. Failure to Intervene Claim Against Del Vecchio

The court grants summary judgment on the failure to intervene claim against Det. Del Vecchio because plaintiff consents. (Pl.'s Br. at 1 n.1).

## CONCLUSION

For the foregoing reasons, defendants' motion is GRANTED as to the failure to intervene claim against defendant Del Vecchio, but DENIED as to the failure to intervene claim against defendant Maracallo.

The Clerk is instructed to terminate the motion. (Docs. ##45, 50).

The parties are directed to submit a joint pretrial order in accordance with the Court's individual practices by January 8, 2016.

Counsel are directed to attend a status conference on January 13, 2016, at 9:30 a.m., at which time the Court will schedule a trial date and set dates for pretrial submissions.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2015 WL 8207492

## Footnotes

1 Plaintiff stipulated to the dismissal, with prejudice, of his claims against the City of White Plains, as well as his claims against the detectives for violation of his First, Fifth, Eighth, and Fourteenth Amendment rights. (Doc. #48).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 3691343
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael DEVITO, Plaintiff,
v.
SMITHKLINE BEECHAM CORPORATION
d/b/a Glaxosmithkline, Defendant.

No. Civ.A. 02–CV–0745NPM.
|
Nov. 29, 2004.

**Attorneys and Law Firms**

De Lorenzo Law Firm, LLP, Schenectady, New York, for Plaintiff, Scott Lieberman, of counsel.

Phillips Lytle, LLP, Buffalo, New York, for Defendant, Paul B. Zuydhoek, of counsel.

King & Spalding, LLP, Atlanta, Georgia, for Defendant, Chilton D. Varner, of counsel.

*MEMORANDUM–DECISION AND ORDER*

MCCURN, Senior J.

I. Preclusion Motion ........ 4

A. Standard for Admissibility of Expert Evidence ........ 6

1. Deborah L. Sweeney ........ 9

a. Qualified? ........ 9

2. Kevin W. George, M.D ........ 10

3. James T. O'Donnell ........ 13

a. General Causation ........ 14

i. Qualified? ........ 14

ii. Reliability of Testimony? ........ 17

b. Specific Causation ........ 19

c. Warnings ........ 19

i. Qualified? ........ 20

ii. Reliability of Testimony? ........ 22

II. Summary Judgment Motion ........ 24

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Introduction

***1** "Between 1987 and 1997, the percentage of Americans being treated for depression more than tripled nationwide[.]" Shankar Vedantam, *Report Shows Big Rise in Treatment for Depression,* WASH. POST, Jan. 9, 2002, at A01. In December 1996, plaintiff Michael DeVito became one of those Americans. At that time, his primary care physician prescribed Paxil, a selective serotonin reuptake inhibitor ("SSRI"). Mr. DeVito takes Paxil to this day, despite attempts through the years to discontinue. DeVito claims that he cannot discontinue taking Paxil because he has become "dependent" upon it. Affidavit of Robert E. Glanville (Oct. 20, 2003), exh. A thereto (Complaint) at 2, ¶ 9. More specifically, plaintiff alleges that he has been unable to stop taking Paxil due to what he characterizes as "withdrawal reactions" or "dependency/withdrawal syndrome," which according to plaintiff "includ[es], but [is] not limited to, dizziness, nausea, shaking, electrical-like shocks and horrible dreams." *Id.* at 2, ¶¶ 7 and 6.

In this lawsuit plaintiff alleges five causes of action against the manufacturer of Paxil, defendant Smithkline Beecham Corporation d/b/a Glaxo Smithkline ("Glaxo"): (1) fraud; (2) negligence; (3) strict liability; (4) breach of express warranty; and (5) breach of implied warranty. There is a great deal of overlap among these five causes of action. The thrust of plaintiff's complaint is that Glaxo failed to adequately warn of "Paxil's addictive qualities and dependency/withdrawal characteristics[.]" *Id.* at 6, ¶ 19; *see also id.* at 3, ¶ 11b); at 7, ¶ 25; and at 8, ¶ 33. [1]

Discovery is complete and Glaxo is now moving for summary judgment pursuant to Fed.R.Civ.P. 56. Pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S .Ct. 2786 (1993), Glaxo is also moving to preclude the testimony of the three witnesses whom plaintiff is proffering as experts. The court will address Glaxo's motion to preclude first because if any or all of the proffered testimony is inadmissible, then that could significantly impact Glaxo's summary judgment motion in terms of the admissible proof before the court. *See Toole v. Toshin Co. Ltd .,* No. 00–CV–821S, 2004 WL 2202580, at *4 (W.D.N.Y. Sept. 29, 2004) (granting defense motion to preclude testimony of plaintiff's expert and declining to consider his report on summary judgment motion).

I. Preclusion Motion

Each of the five causes of action which plaintiff alleges requires him to prove causation. "Under settled New York law, whether the action is pleaded in strict products liability, breach of warranty or negligence, the plaintiff in a products liability case bears the burden of establishing that a defect in the product as a substantial factor in causing the injury." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 434 (W.D.N.Y.2001) (internal quotation marks and citation omitted). Common law fraud likewise "requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 580 (E.D.N.Y.2002) (internal quotation marks and citation omitted). To establish causation here, plaintiff DeVito "must offer admissible testimony regarding *both general causation," i.e.* that Paxil can cause the type of symptoms of which plaintiff complains when attempting to discontinue that drug, *"and specific causation," i.e.* that Paxil actually caused DeVito's alleged symptoms upon discontinuation of Paxil. *See Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 268 (2d Cir.2002) (citation omitted) (emphasis added); *see also Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 314 (D . Vt.2002) (citations omitted) ("Plaintiffs ... must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case."). In the context of Paxil litigation, "the general causation question is limited to whether discontinuation from Paxil is *capable* of causing dizziness, agitation, anxiety, nausea, etc." *In re Paxil Litigation,* 218 F.R.D. 242, 249 (C.D.Cal.2003). Specific causation, on the other hand, focuses on whether a plaintiff can "prove that [his] symptoms came from Paxil, as opposed to, for example, the relapse of the underlying illness or the consumption or discontinuation of other drugs." *Id.*

***2** To establish causation, plaintiff DeVito seeks to offer the testimony of three "expert" witnesses: (1) Mr. John T. O'Donnell, a pharmacist with a Master's Degree in nutrition; (2) Dr. Kevin W. George, a former psychiatrist of plaintiff's; and (3) Ms. Deborah Sweeney, plaintiff's treating nurse practitioner. Glaxo is seeking to "preclude ... [these] experts from offering any opinion that: (I) Paxil causes substance dependence, or is either addictive or habit-forming; or (ii) that plaintiff is addicted to Paxil or has developed substance dependence as a result of taking it." Memorandum of Law in

Support of Glaxosmithkline's Motion to Preclude Plaintiff's Experts' Testimony Pursuant to Fed.R.Evid. 702 and *Daubert* ("Def. Preclude Memo.") at 4. In preparation for trial, each of these witnesses has been deposed and Mr. O'Donnell has provided an "expert" report on plaintiff's behalf. Apart from these witnesses, plaintiff proffers no other causation evidence.

To support his theory that Paxil is defective due to an inadequate warning, plaintiff is relying solely upon the deposition testimony and "expert" report of Mr. O'Donnell. Glaxo argues for the preclusion of "[h]is warnings 'opinions" ' because O'Donnell is not qualified to testify on that issue and even if he were, "his opinions are neither reliable nor scientific." Def. Preclude Memo. at 24.

A. Standard for Admissibility of Expert Evidence

There is a two-part inquiry in deciding the admissibility of expert evidence. First, in accordance with Fed.R.Evid. 702, "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue." ' *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702); *see also Kass v. West Bend Company,* No. 02–CV–3719, 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004) (citation omitted) ("As a threshold matter, the court must examine [the witness'] qualifications to testify about alternative ... designs.") Second, "in the form of an opinion or otherwise," the court must insure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In other words, whether an expert witness' "opinion is ultimately admissible depend on the reliability and relevance of the proffered testimony." *Kass,* 2004 WL 2475606, at *5.

In this regard, the Supreme Court has instructed the by now oft-cited rule that a district court must act as "a gatekeeper to exclude invalid and unreliable expert testimony." *Bonton v. City of New York,* No. 03 Civ. 2833, 2004 WL 2453603, at *2 (S.D.N.Y. Nov. 3, 2004) (citation omitted). This gatekeeping obligation applies whether the proposed expert testimony is based upon scientific knowledge, "technical," or some other "specialized" knowledge. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999) (citing Fed.R.Evid. 702). As with other types of evidence, the court must also bear in mind that under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403. In *Daubert* the Supreme Court soundly reasoned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the *judge* in weighing possible prejudice against probative force under Rule 403 ... *exercises more control over experts* than over lay witnesses." *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798 (quotation marks and citation omitted) (emphasis added). Finally, it should be noted that "[t]he proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof." *Bonton,* 2004 WL 2453603, at *2 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76 (1987)). This burden is the same regardless of whether the issue is the "qualification[s] of a person to be a witness, ..., or the admissibility of the evidence" itself. Fed.R.Evid. 104(a). In the present case, this requires plaintiff Devito to prove by a preponderance of the evidence that each of the three witnesses whom he is proposing to call as an expert qualify as such; *and* that the proposed testimony of each is admissible.

***3** "In assessing expert qualifications, '[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." ' *Kass,* 2004 WL 2475606, at *4 (quoting *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994) *aff'd* 101 F.3d 682 (2d Cir.1996)). "So long as the expert stays within the 'reasonable confines of his subject area,' the expert can fairly be considered to possess the 'specialized knowledge' required by Rule 702." *Id.* (quoting *Lappe,* 857 F.Supp. at 227) (other citation omitted).

"In *Daubert,* the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Id.* (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). "These factors do not, however, constitute a 'definitive checklist or test." ' *Id.* (quoting *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796). "Rather, they are intended to be applied flexibly, depending on the particular circumstances of the

particular case at issue." *Id.* (citing *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

In *Kumho,* the Supreme Court recognized that "when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *Houlihan v. Marriott International, Inc.,* No. 00 Civ. 7439, 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003) (citing *Kuhmo,* 526 U.S. at 151, 119 S.Ct. at 1175). "For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods." *Id.* (citation omitted). Regardless of which criteria a court applies to assess the admissibility of expert testimony, "the Supreme Court has made clear that the district court has a 'gatekeeping function' under Rule 702—is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." ' *Amorgianos,* 303 F.3d at 265 (quoting *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786) (other citation omitted). Finally, it should be noted that " 'the gatekeeping inquiry must be tied to the facts of a particular case[.]" ' *Id.* at 266 (quoting *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

1. Deborah L. Sweeney

a. Qualified?

Glaxo's motion to preclude the testimony of Ms. Sweeney [2] requires little if any analysis. Glaxo is moving to preclude her testimony because it does not believe she is qualified to testify as an expert. Additionally, Glaxo contends that "her proposed opinion lacks a reliable scientific foundation." Def. Preclude Memo. at 26. Plaintiff did not bother to respond to this aspect of Glaxo's motion. This lack of response amounts to a concession by plaintiff that the court should exclude Ms. Sweeney's testimony. *Cf. Green v. Doukas,* No. 97 CIV.8288CMGAY, 2001 WL 767069, at *8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests ... it has merit[ ]"). Accordingly, the court grants Glaxo's motion to the extent it is seeking preclusion of Ms. Sweeney's testimony. *See Amaker v. Coombe,* No. 96 Civ. 1622, 2003 WL 21222534, at *6 (S.D .N.Y. May 27, 2003) (granting motion to preclude where plaintiff defaulted); *see also Martinez v. Sanders,* No. 02 Civ.5624, 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) (because plaintiff did not respond to motion, court granted same on "default" theory) (and cases cited therein).

2. Kevin W. George, M.D.

***4** Glaxo also seeks to preclude the testimony of Dr. Kevin George. Dr. George is a psychiatrist who saw Mr. DeVito in consultation twice—once on November 2, 2001 and again on December 13, 2001. Glanville Aff., exh. G thereto at 51 and 76.

Glaxo is not challenging Dr. George's qualifications, but rather the nature of his testimony. Glaxo is seeking to exclude Dr. George's testimony because he "has expressly disavowed all of the opinions that plaintiff ascribed to him in plaintiff's expert disclosure." Def. Preclude Memo. at 25. Further, even if Dr. George had not disavowed those opinions, Glaxo argues that his "proposed testimony [is] inadmissible because it lacks any reliable scientific foundation." *Id.*

Plaintiff's response focuses almost exclusively on Dr. George's qualifications, which are not in dispute. As to the opinions which plaintiff attributes to Dr. George, the sum total of plaintiff's response is that any alleged "shortcomings" in that testimony go to weight and credibility, and not to admissibility. Memorandum of Law in Opposition to Defendant's Motion to Preclude Plaintiff's Experts ("Pl. Opp'n Preclude") at 5. The court disagrees. As will be seen, Dr. George's purported opinion testimony does not have simply a few "shortcomings." It has glaring holes in terms of reliability, not the least of which is Dr. George's unequivocal deposition testimony disavowing that he made the opinions which plaintiff claims he did.

In his expert disclosure plaintiff specifically identifies Dr. George as an "expert" whom he intends to call at the time of trial. Glanville Aff., exh. E thereto at 1. According to plaintiff's expert disclosure, Dr. George will testify as follows:

> that in his opinion, within a degree of reasonable medical certainty, ... [1] the plaintiff is experiencing withdrawal reactions from the drug Paxil and that each time the plaintiff attempts to 'wean' himself off of the drug or to lower the dosage of the drug, the plaintiff experiences said withdrawal; 2) ... the plaintiff's withdrawal signs and symptoms are a result of the plaintiff ingesting Paxil; and 3) ... the

> plaintiff has sustained injury in that he has been unable to discontinue the use of Paxil and has been caused to suffer the signs and symptoms of the withdrawal syndrome associated with the use and attempted discontinuance of Paxil.

Glanville Aff., exh E thereto. Dr. George is confining his opinions to how Paxil allegedly *effected* plaintiff DeVito—not whether Paxil is *capable generally* of causing the symptoms of which DeVito complains. Therefore, although the plaintiff did not specify the purpose for which he is offering Dr. George's testimony, presumably it is being offered on the issue of specific causation.

As noted earlier, ordinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony. Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition. Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same. Each time he answered no. *See* Glanville Aff., exh. G thereto at 88–91. Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George.

***5** Even if Dr. George had not expressly disavowed the opinions set forth above, the court still must exclude his testimony. The crux of each of these opinions is that plaintiff DeVito has "withdrawal reactions," or "withdrawal signs and symptoms" caused when he attempts to discontinue or taper below a certain dosage of Paxil. Glanville Aff., exh. E thereto. Dr. George's deposition testimony did not so state such. To be sure, Dr. George did testify that he used "Paxil withdrawal" as a *"label* to capture what [DeVito] was describing that he had been experiencing." *Id.,* exh. G thereto at 59 (emphasis added). When later in his deposition Dr. George was pressed as to whether or not he diagnosed plaintiff "as suffering from Paxil withdrawal [,]" he reiterated that he *"applied that label* to describe the symptoms that [DeVito] reported in relation to tapering Paxil." *Id.* at 102 (emphasis added).

There is an obvious difference between labeling a symptom which a patient describes and actually diagnosing that person. Significantly, Dr. George did *not* diagnosis plaintiff with Paxil withdrawal. Perhaps that is because "Paxil withdrawal is not a formal diagnosis within DMS–IV[.]" *Id.* at 94. ("The DSM–IV is the Diagnostic and Statistical Manual, the fourth revision of it, that psychiatrists generally base their diagnoses on." *Id.*) And, "[t]here is no criteria for diagnosing somebody with Paxil withdrawal." *Id.* at 60. For example, there are no "objective tests or assessments," aside from skin inspection for signs of sweating, "that could have been done to determine whether those reports [by DeVito] were genuine[.]" *Id.* at 62. So, Dr. George simply took plaintiff's description of his symptoms at "face value," and made no attempt to determine whether [DeVito's] report of those symptoms was genuine [.]" *Id.* at 62 and 79.

In light of the foregoing, even if Dr. George were inclined to testify that Paxil specifically caused the symptoms which plaintiff claims it did, there is no foundation for this testimony. What is particularly revealing in this regard is Dr. George's candor when asked: "Have you ever made any determination as to why Mr. DeVito's tapering off of Paxil may be taking longer than some of your other patients?" ' *Id.* at 100. Dr. George replied, "I had *no scientific way,* ..., of explaining why he was having such difficulty tapering off Paxil." *Id.* (emphasis added).

Further, plaintiff DeVito saw Dr. George in the latter's capacity as a treating psychiatrist. Thus, as is plain from Dr. George's deposition, he was concerned primarily with the symptoms of which plaintiff complained, not determining the underlying cause. *See Munafo v. Metropolitan Transportation Authority,* Nos. 98 CV–4572, 00–CV–0134, 2003 WL 21799913, at *19 (E.D.N.Y. Jan. 22, 2003). Had Dr. George been focusing on the underlying cause, undoubtedly he would have performed a differential diagnosis, which "typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Housing Corp .,* No. CV 94–4009, 1998 WL 623589, at *19 (E.D.N.Y. Aug. 17, 1998) (citations omitted). But, Dr. George did not. Without a differential diagnosis, specific causation cannot be established. *See id.* ("To establish specific causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a 'differential diagnosis." ')

3. James T. O'Donnell

***6** Glaxo argues that the court must preclude O'Donnell's testimony for two reasons. First, he is not qualified as an expert as to the issues upon which he is being asked to opine—

general and specific causation and the adequacy of the Paxil warnings. Second, even if he does qualify as an expert, Glaxo contends that the court should preclude his opinions because they lack the requisite scientific foundation and are otherwise unreliable. Plaintiff responds that O'Donnell's "experience and credentials are impressive [,]" whether the issue is his qualifications to testify as an expert on causation or as an expert on warnings. Pl. Preclude Memo. at 4. Plaintiff further responds that regardless of whether O'Donnell is opining on causation or warnings, any alleged "shortcomings" in that testimony go to "weight and credibility, and not [to] ... admissibility." *Id.* at 5 (citation omitted).

Plaintiff DeVito is offering O'Donnell's testimony on three separate issues, which require different areas of expertise. The court will examine O'Donnell's qualifications as to each.

a. General Causation

Glaxo offers a host of reasons as to why O'Donnell "is not an 'expert' on scientific issues concerning general *or* specific causation" with respect to SSRIs or Paxil. Def. Preclude Memo. at 7 (emphasis added). All of these reasons have merit.

i. Qualified?

This is not the first court to be confronted with the issue of whether Mr. O'Donnell is qualified to give an expert opinion here. In *Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672 (W.D.Tex.2002), the court found that he was *not* qualified to render an opinion on general causation. *Id.* at 679. There, the parents of a 16 year old girl claimed that Accutane, a prescription acne medication manufactured by the defendant, caused or precipitated the onset of their daughter's schizophrenia. In much the same way plaintiff DeVito is offering O'Donnell's testimony here, the plaintiffs in *Newton* offered O'Donnell as an expert "to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia." *Id.* at 677. After outlining a number of ways in which O'Donnell's qualifications were lacking, the court expressly found that he was not qualified to render such an opinion.

To support that conclusion, the *Newton* court relied upon O'Donnell's deposition testimony, which is substantially similar to his deposition testimony in this case. For example, O'Donnell testified in *Newton,* as he did here, that "he has never earned an M.D., a Ph.D., or any degree in pharmacology." *Id.* at 677; *see also* O'Donnell Dep'n at 24–25 and 53. Yet, he "still holds himself out as a 'doctor' and a pharmacologist[.]" *Id.* As in *Newton,* "O'Donnell ... [continues to] grant[ ] himself the title of 'doctor' in reliance upon his Pharm.D degree, [which] he conceded in his deposition that in the majority of pharmacy schools, th[at] ... degree is 'an entry-level degree' that pharmacists must have to ... even practice pharmacy." *Id.* at 677 n. 2 (citation omitted); *see also* O'Donnell Dep'n at 24–25. In contrast, to obtain a degree in pharmacology usually three or four years of graduate school is required. O'Donnell Dep'n at 25–26. O'Donnell did get a graduate degree, but it was not in pharmacology. O'Donnell's formal education consists of a four year degree in pharmacy and a Master's Degree in clinical nutrition. *Id.* at 27.

***7** In addition to questioning O'Donnell's background generally, the *Newton* court pointed out his "lack [of] appropriate pharmacological training relevant to the issues" therein, *i.e.* "Accutane, Vitamin A, schizophrenia, or psychosis[.]" *Id.* at 678. The same may be said here. There is no factual basis upon which this court can find that O'Donnell is an expert regarding SSRIs generally, not to mention Paxil or discontinuation of Paxil. Indeed, as his deposition testimony shows, O'Donnell's asserted expertise on these subjects is non-existent. *See id.* at 21, 24; 38–40; and 45.

Given that SSRIs are a fairly recently developed class of drugs, understandably they were not the subject of O'Donnell's course work as an undergraduate, or when getting his Master's Degree in nutrition. *Id.* at 21 and 24. Since that time, O'Donnell has done nothing to advance his own knowledge as to SSRIs generally or Paxil in particular. When directly asked if he had "done any clinical research whatsoever relating to antidepressants," O'Donnell replied that he had not. *Id.* at 38. He responded the same way when asked if he had "done any scientific research concerning Paxil or SSRI antidepressants[.]" *Id.* at 39. Moreover, O'Donnell conceded that the first time he "review[ed] ... scientific literature in connection with Paxil discontinuation symptoms[ ]" was for this case. *Id.* at 40–41.

This is the sort of "litigation-drive expertise" which courts have eschewed. To illustrate, the court in *Mancuso,* 967 F.Supp. at 1443, reasoned that it could not "help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such be selective review of the relevant literature." This appears to be an apt description of what Mr. O'Donnell attempted to do in the present case.

The court stresses that it is no single factor which is dispositive of whether O'Donnell qualifies as an expert on the issue of general causation. Rather, it is the cumulative effect of the foregoing which convinces the court that O'Donnell lacks the lack of relevant "knowledge, skill, experience, training or education" to testify as an expert on the issue of general causation *vis-a-vis* the discontinuation of Paxil. As he admitted, O'Donnell is *not* a pharmacologist. Therefore, he cannot, as he does in his "expert report," opine to a "reasonable pharmacological certainty," that plaintiff is experiencing "withdrawal toxicity reactions from Paxil[.]" O'Donnell Rep. Clearly, allowing a pharmacist/nutritionist such as O'Donnell to testify in that way would run afoul of the rule that an expert must stay "within the reasonable confines of his subject area[.]" ' *Kass,* 2004 WL 2475606, at *2475606, at *4 (internal quotation marks and citations omitted). Simply put, the court agrees with the court's comment in *Newton* that "[p]laintiff's attempts to present O'Donnell as an expert pharmacologist [is] ... an extremely bold stretch." *Newton,* 243 F.Supp.2d at 279. [3]

ii. Reliability of Testimony?

***8** O'Donnell's lack of education, training and background as to Paxil becomes even more apparent when viewed in terms of the opinions which he has rendered in this case. That is so because a "court's evaluation of qualifications is not always entirely distinct from the court's evaluation of reliability." *Pearson v. Young,* No. CIV–99–1559–F, 2002 WL 32026157, at *3 (W.D.Okla. Jan. 17, 2002).

O'Donnell's opinion as to causation is that "DeVito is experiencing withdrawal toxicity reactions from Paxil, and indeed, each time he attempts to wean or lower the dosage, he again experiences such infinity [sic]." Glanville Aff., exh. E thereto. O'Donnell states that when plaintiff's dosage of Paxil is lowered, he suffers from the following "withdrawal signs and symptoms [:] anxiety, jitery [sic], agitation, nausea, drowsiness, generalized discomfort and vertigo[.]" O'Donnell Report at 2. "For this opinion to be admissible, O'Donnell must have a *reliable scientific basis* to support not only (1) a casual relationship between" Paxil and the enumerated side-effects, "but also (2) his assertion that [Paxil] will produce these side-effects." *See Newton,* 243 F.Supp.2d at 679 (emphasis added). O'Donnell's report and deposition testimony are void of a scientific basis to support either of those assertions.

In terms of publications, O'Donnell testified that he was the editor of a non-peer reviewed book entitled "Drug Injury Liability, Analysis and Prevention." *Id.* at 98–99. That book contained a mere six sentences on SSRIs, including the two sentences on Paxil. *Id.* at 99. Given that minimal reference to SSRIs, it is not surprising that that book contains nothing about discontinuation symptoms. *See id.* It further appears that he has performed absolutely no research regarding Paxil, much less its discontinuation. *Id.* at 38–39. What is more, O'Donnell has done no scientific or clinical research of any kind for almost two decades. The last time he did any such research was in he "early '80s as part of a pharmacology lab sabbatical," where he was looking at vitamins and critical care drugs used in Intensive Care Units. *Id.* at 36.

In light of the foregoing, to allow plaintiff to rely upon Mr. O'Donnell's opinions as to general causation clearly would violate *Daubert'* s "requirement that the expert testify to scientific knowledge—conclusions support by good grounds for each step in the analysis[.]" ' *Amorgianos,* 303 F.3d at 267 (citations and quotation marks omitted).

b. Specific Causation

It stands to reason that if Mr. O'Donnell lacks (which he does) the qualifications to testify as to general causation, he lacks the qualifications to testify as to specific causation. His opinion as to specific causation suffers from the same infirmities, detailed above, as to general causation. Accordingly, the court finds that Mr. O'Donnell does not have the requisite qualifications to testify as to specific causation; and even if he did, his opinions in that regard are unreliable.

c. Warnings

***9** Glaxo contends that because O'Donnell "lacks any pertinent qualifications[,]" Def. Memo. at 14, he should not be allowed to testify that in his opinion the "lack of ... a precaution and warning about withdrawal risk and the need to taper [when discontinuing Paxil] renders the product defective due to an inadequate warning. *See* O'Donnell Report at 3. Plaintiff did not directly respond to this argument. Included in the list of highlighted credentials in plaintiff's memorandum of law is that Mr. O'Donnell "is currently involved in the teaching of New Drug Development and Regulations [.]" Pl. Opp'n Memo. at 2. However, plaintiff does not explain, or cite to any portion of O'Donnell's deposition explaining, how or why this position qualifies him to testify as an expert on warnings.

As with the other issues upon which plaintiff intends to offer O'Donnell's testimony, plaintiff baldly retorts that O'Donnell's “extensive experience qualifies as specialized knowledge gained through experience, training, or education[.]” Pl. Memo. at 4 (internal quotation marks and citations omitted). And, once again, he relies upon the argument that Glaxo's reasons to preclude O'Donnell's testimony regarding warnings should be saved for trial, *i.e.* they should be used to attack O'Donnell's credibility and the weight which the jury might give to his opinions regarding Paxil warnings.

i. Qualified?

O'Donnell “claim[s] to be an expert in drug labeling[.]” O'Donnell Dep'n at 90. Presumably he is including drug warnings within the province of this supposed expertise. In any event, to qualify as an expert it is not enough for a witness to simply declare that he is one. Federal Rule of Evidence 702 requires more. As plaintiff acknowledged, a witness must satisfy the court that he has a certain amount of “knowledge, skill, experience, training or education [ ]” in the relevant field before he can be deemed an expert. *See Nora Beverages,* 164 F.3d at 746 (internal quotation marks and citation omitted). Close examination of O'Donnell's deposition testimony reveals that he is lacking in each of those areas when it comes to the subject of the adequacy of prescription drug warnings.

O'Donnell's claimed expertise admittedly is “through experience,” not through formal education. O'Donnell Deposition at 90–92. His experience consists primarily of having attended continuing education (“CE”) programs, where drug labeling was a topic. *Id.* Those CE programs were to satisfy his pharmaceutical and nutritionist CE requirements, however; and he was unable to elaborate on the substance of same. *See id.* Furthermore, O'Donnell has not consulted with any pharmaceutical company “concerning the labeling for any antidepressant[.]” *Id.* at 96. O'Donnell agrees “that the FDA [Food and Drug Administration] is the highest authority on how drugs are labeled in this country[,]” but he has also never consulted with them “concerning the labeling for any antidepressant. *Id.* For that matter, O'Donnell has not worked for or consulted with the FDA in any capacity. *See* Glanville Aff. at 9, ¶ 39. Thus, O'Donnell's experience in this area is extremely limited.

***10** Moreover, O'Donnell made two especially damaging concessions which seriously undermine the suggestion that he is an expert as to the adequacy of prescription drug warnings. O'Donnell readily agreed “that in assessing the adequacy of a label for a prescription drug, the expert rendering the opinion generally should be familiar with the clinical trials data on the drug as it relates to the side effect concerning which he is opining[.]” *Id.* at 192. Yet, O'Donnell frankly admitted that he had not reviewed any of the Paxil clinical trials data. *See id.* Similarly, O'Donnell conceded that “generally to reach a conclusion regarding the adequacy of a label for a prescription drug, the expert rendering the opinion should be familiar with at least a majority of the available medical literature on the drug as it relates to the side effect on which he is opining[.]” *Id.* at 193. Despite the foregoing, O'Donnell went on to testify that he has “not read the specific literature [ ]” relating to discontinuation symptoms of Paxil. *Id.* 193 and 45. In fact, he has only read “abstracts” of articles. *Id.* at 46–47. Finally, Mr. O'Donnell has not lectured on, or written anything (peer reviewed or not) about, “Paxil discontinuation symptoms apart from [his] export [sic] report in this case[.]” *Id.* at 45. As the foregoing clearly shows, Mr. O'Donnell does not “employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[,]” which here is the adequacy of prescription drug warnings and Paxil in particular. *See Kumho Tire,* 526 U .S. at 152, 119 S.Ct. at 1176.

Mr. O'Donnell may qualify as an expert in the fields of pharmacy or nutrition, but that is not the purpose for which his testimony is being offered here. Instead, his testimony is being offered on the adequacy of Paxil warnings. O'Donnell has never been drafter or been asked to draft a warning for any antidepressant, let alone for Paxil. Likewise, he has not done any research or written any publications on prescription drug warnings. Thus, whether judged in terms of his education or experience, does not rise to the level of “expertise ... that the jury would expect from a bona fide warnings expert.” *See Robertson v. Norton,* 148 F.3d 905, 907 (8th Cir.1998) (internal quotation marks omitted).

In sum, O'Donnell is being called upon to testify regarding the adequacy of the Paxil warning, an issue which clearly is outside the “reasonable confine [s] of his subject area[s,]” which are pharmacy and nutrition. *See Kass,* 2004 WL 2475606, at *4 (internal quotation marks and citations omitted). Therefore, because O'Donnell does *not* “possess the specialized knowledge required by Rule 702[,]” the court finds that he is not qualified as an expert on the issue of the adequacy of the Paxil warning. *See id.*

ii. Reliability of Testimony?

***11** Given the nature of the claims which plaintiff is alleging in this case, plainly there is a close relationship between excluding the causation opinion and excluding the warning opinions which are being offered by O'Donnell. *Miller v. Pfizer, Inc.,* 196 F.Supp.2d 1062 (D.Kan.2002), *aff'd on other grounds,* 356 F.3d 1326 (10 th Cir.2004), *cert. denied,* 125 S.Ct. 40 (Oct. 4, 2004), provides a good example of how a decision to preclude causation "expert" testimony impacts upon a decision to also preclude warning testimony. The plaintiff parents in *Miller* were suing the manufacturer of Zoloft, another SSRI, alleging that it caused their son to commit suicide. Similar to the present case, the plaintiffs in *Miller* asserted state law claims for strict liability for marketing defects and misrepresentations, and negligence for failure to test and warn. The court held that an "eminent" psychiatrist and neuropsychopharmocologist's proposed testimony regarding general causation, *i.e.* that Zoloft causes suicide, did not satisfy the *Daubert* criteria for admissibility because, in short, "he lack[ed] sufficient expertise on the issue of suicide." *Id.* at 1087 and 1088. The *Miller* court, as is this court, was then confronted with the issue of whether that same doctor could qualify as an expert who would opine "that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide." *Id.* at 1088. After finding that the doctor was not an expert on that issue, the court soundly reasoned, "[i]f the jury will hear no evidence that [Paxil] causes [withdrawal symptoms/ addictive], it cannot possibly conclude that [Paxil] labels do not adequately warn against the danger that [Paxil] causes [such condition.]" *Id.* at 1089. That reasoning applies with equal force here. Even if O'Donnell qualifies as a prescription drug warning expert, because neither O'Donnell nor Dr. George (plaintiff's only proof as to causation) qualify to testify about causation, the former's warning testimony "would essentially be irrelevant to any larger issues in the case." *See id.* Accordingly, there is no need to analyze whether O'Donnell's opinions as to warnings pass muster under *Daubert.*

In short, plaintiff DeVito has not sustained his burden of proving by a preponderance of the evidence that Mr. O'Donnell is qualified to render an opinion as to general causation, specific causation, or the adequacy of Paxil warnings. Even if O'Donnell could somehow be deemed to have the requisite "specialized knowledge" to testify as to any or all of those issues, "courts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert." ' *Prohaska,* 138 F.Supp.2d at 438 (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. (1997)). That is all O'Donnell has to rely upon; simply because he offers an opinion which he claims to be valid, plaintiff assumes it is so. This court will not, however.

***12** For the reasons set forth above, the court grants in its entirety Glaxo's motion to preclude the testimony of Mr. O'Donnell; Dr. George; and Ms. Sweeney.

II. Summary Judgment Motion

The court assumes familiarity with the Supreme Court's trilogy of cases clarifying the governing legal standards on summary judgment motions, and sees no need to repeat those standards herein. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)

It is an understatement to say that the wholesale exclusion of the testimony of O'Donnell, George and Sweeney significantly impacts plaintiff DeVito's case. As discussed at the outset causation is a necessary element of each of the five causes of action which plaintiff is alleging herein. Because plaintiff's only causation evidence has been excluded, it necessarily follows that Glaxo is entitled to summary judgment in its favor. *See Kass,* 2004 WL 2475606 (after granting motion to exclude testimony of plaintiff's claimed expert regarding the feasibility of alternative designs, court granted defense summary judgment motion because plaintiff could not satisfy the critical element of a design defect cause of action); and *Zwillinger,* 1998 WL 623589 (where plaintiff claimed that her exposure to defendants' carpeting causes her to develop immunotoxicity syndrome, court granted summary judgment in defendants' favor after excluding the of doctor's testimony, which was plaintiff's only causation evidence).

To conclude, the court hereby GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline, to preclude the testimony of James O'Donnell; Dr. Kevin George; and Ms. Deborah Sweeney. The court further GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing all of plaintiff Michael DeVito's claims as against it.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2004 WL 3691343

## Footnotes

1 The present action, which has been referred to as a "tag-along action," is one of a number throughout the country wherein plaintiffs are alleging that Glaxo knew of the hazardous side effects of Paxil and either concealed, misrepresented or failed to warn of them. *See In re Paxil Products Liability Litigation,* 296 F.Supp.2d 1374 (Judicial Panel on Multidistrict Litigation 2003). In mid-February 2004, this court was advised that the Judicial Panel on Multidistrict Litigation ("the Panel) had conditionally transferred this action to the United States District Court fo the Central District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." Glaxo moved to vacate that conditional transfer as it pertained to the present case. When plaintiff did not respond, on June 15, 2004, the Panel vacated that conditional transfer as it relates to Mr. DeVito.

2 During her deposition Ms. Sweeney unequivocally testified, "I'm not a physician. I'm not a nurse practitioner." Glanville Aff ., exh H thereto at 123. She holds an associates' degree in nursing, a bachelor of science degree in health and human services, and a nurse practitioner's degree." *Id.* at 12, 17, 35–36. Thus, to refer to Ms. Sweeney as "Doctor Sweeney, as plaintiff does throughout his expert disclosure, is not only a misstatement but directly contradicts Sweeney's own testimony. Plaintiff's tendency to exaggerate or overstate certain things, as will be seen, is not limited to the qualifications of his experts.

3 O'Donnell's insistence on holding himself out as a pharmacologist, *see* O'Donnell Dep'n at 54, ignores at least one fundamental distinction between pharmacology and pharmacy—a distinction which is critical here. "Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on the other hand, is the profession of preparing and dispensing drugs." *Newton,* 243 F.Supp.2d at 677, n. 1. It is self-evident that there is a vast difference in the education, experience and skill necessary to obtain degrees in these two different fields.

Apparently O'Donnell recognizes this distinction because in *Newton* he "admitted ... that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business." *Id.* at 677, n .3 (citation omitted). He made that same admission in this deposition herein. O'Donnell Dep'n at 28–31. O'Donnell did change this advertisement because, in his words, it was "incorrect." *Id.* at 29. This court cannot overlook what at best appears to be a serious lapse in judgment, however.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1410348
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Mario FRANCO, Plaintiff,
v.
CITY OF SYRACUSE, Police Officer John Gunsalus, Police Officer Shawn Kelly, and Unidentified Syracuse Police Officers, Defendants.

5:16-CV-634 (FJS/TWD)
|
Signed 03/28/2019

**Attorneys and Law Firms**

OF COUNSEL, FRED B. LICHTMACHER, ESQ., THE LAW OFFICE OF FRED LICHTMACHER P.C., 116 West 23rd Street, Suite 500, New York, New York 10011, Attorney for Plaintiff.

OF COUNSEL, CHRISTINA F. DEJOSEPH, ESQ., TODD M. LONG, ESQ., CITY OF SYRACUSE CORPORATION COUNSEL, City of Syracuse Corporation Counsel, 233 East Washington Street, Room 300 City Hall, Syracuse, New York 13202, Attorneys for Defendants.

## MEMORANDUM-DECISION AND ORDER

Frederick J. Scullin, Jr., Senior United States District Judge

## I. INTRODUCTION

***1** Mario Franco ("Plaintiff") commenced this action against, among others, the City of Syracuse ("Defendant City of Syracuse"), Police Officer John Gunsalus ("Defendant Gunsalus"), and Police Officer Shawn Kelly ("Defendant Kelly") (hereinafter collectively referred to as "Defendants") seeking declaratory relief, compensatory damages, punitive damages, costs and disbursements, and attorney's fees for alleged violations of his civil rights. *See generally* Dkt. No. 50, Amended Complaint. Defendants have moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See generally* Dkt. No. 80.

## II. BACKGROUND

At approximately 11:30 p.m. on July 4, 2014, Plaintiff drove to a party on Victoria Place in Syracuse, New York. Plaintiff learned about the "college party" from his friends, who traveled to the party separately and discovered upon arrival that police officers were clearing people out of the house. There were at least seventy people congregated outside; and, as people were leaving, an altercation started. Due to the situation, Plaintiff's friends drove past the party and parked the vehicle away from the location.

Throughout this time, one of Plaintiff's friends, Elijah Johnson, was on the phone with Plaintiff describing the events. Mr. Johnson advised Plaintiff not to come to the party because the police were there but Plaintiff drove to the location anyway. When Plaintiff arrived, there were at least two marked police vehicles at the house. Plaintiff saw his friends' parked car on the opposite end of the street and began walking towards them. When Plaintiff arrived at his friends' car, he leaned his head inside the driver's side window to talk with the occupants.

According to Defendants, at this time, Defendant Gunsalus was 15-20 feet from Plaintiff and gave him a verbal command to disperse. Defendants assert that Defendant Gunsalus repeated this verbal command as he approached but Plaintiff disregarded it. Defendant Gunsalus claims that he then approached Plaintiff from his right, tapped him on the shoulder and advised him in a clear voice that he was under arrest. Defendant Gunsalus asserts that Plaintiff did not comply with his verbal commands to put his hands behind his back and attempted to flee. Defendant Gunsalus also claims that Plaintiff became aggressive toward him and physically challenged him. Defendant Kelly claims that he witnessed the situation and came to Defendant Gunsalus' aid because he feared for the safety of all individuals involved. According to Defendants, although Plaintiff was resisting arrest aggressively, neither Defendant Gunsalus nor Defendant Kelly used force other than that necessary to handcuff Plaintiff. Defendant Gunsalus also asserts that he eventually handcuffed Plaintiff without any assistance. Lastly, Defendants claim that Plaintiff never advised the officers that he was missing an earring or that he had any injuries other than headaches and minor scrapes from the incident.

Not surprisingly, Plaintiff's version of what occurred differs from Defendants'. According to Plaintiff, Defendant Gunsalus made no announcement for everyone to disperse, nor did he give any order as he approached him from his

right side. Plaintiff asserts that Defendant Gunsalus instantly grabbed him by the shoulders, aggressively turned him around, pinned him against the car, cursed at him, hurled racial slurs at him, punched him in his face knocking him to the ground, and continued to strike him repeatedly. According to Plaintiff, he did not put his hands on the officers at any time. Plaintiff states that both Defendant Gunsalus and Defendant Kelly were violent with him even though he did not resist arrest. Plaintiff claims that, due to Defendants' unprovoked violence towards him, he had injuries to his face, stomach, and ribs and also suffered headaches. Finally, Plaintiff asserts that he was missing one of his earrings and another was damaged as a result of the incident.

***2** On July 4, 2014, Plaintiff was charged with and prosecuted for disorderly conduct, resisting arrest, and harassment. Plaintiff was ultimately acquitted of all charges at trial during the week of June 15, 2015.

Based on these allegations, Plaintiff asserts the following seven causes of action [1] :

(1) Excessive force against the individual defendants pursuant to 42 U.S.C. § 1983 [2] ;

(2) Failure to intervene against the individual defendants pursuant to 42 U.S.C. § 1983;

(3) False arrest against the individual defendants pursuant to 42 U.S.C. § 1983;

(4) Malicious prosecution against the individual defendants pursuant to 42 U.S.C. § 1983;

(5) Denial of the right to a fair trial against the individual defendants pursuant to 42 U.S.C. § 1983;

(6) Illegal seizure of his property against the individual defendants pursuant to 42 U.S.C. § 1983; and

(7) Municipal liability pursuant to *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L.Ed. 2d 611 (1978), against Defendant City of Syracuse. [3]

## III. DISCUSSION

### A. Legal standards governing a motion for summary judgment

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Under this Rule, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all reasonable inferences, in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

### B. 42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983,

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]

***3** 42 U.S.C. § 1983.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." [4] *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).

### C. Defendants' motion for partial summary judgment

#### *1. Failure to intervene in the use of excessive force and Plaintiff's false arrest against Defendant Kelly [5] pursuant to 42 U.S.C. § 1983*

" 'It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.' " *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ). "An officer who

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

fails to intercede is liable for the preventable harm caused by the actions of other officers where he or she observes or has reason to know that those other officers are violating a person's constitutional rights by using excessive force or making an unjustifiable arrest." *Chepilko v. City of New York,* No. 06-CV-5491 (ARR) (LB), 2012 WL 398700, *8 (E.D.N.Y. Feb. 6, 2012) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ). "Liability may attach only when, (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing [*O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988) ] ) (other citation omitted).

***a. Direct participant theory regarding excessive force***

Defendants argue that Defendant Kelly cannot be held liable for failing to intervene to prevent the alleged unauthorized use of force because Plaintiff asserts liability under a theory of direct participation. According to Defendants, Plaintiff alleges that Defendant Kelly struck him five to six times in the ribs and, therefore, cannot be held liable for failing to intervene because he was a direct participant in the alleged excessive force.

***4** The Court disagrees. As Plaintiff asserts, he may hold Detective Kelly liable for one cause of action or the other. *See Buchy v. City of White Plains,* No. 14 CV 1806, 2015 WL 8207492, *3 (S.D.N.Y. Dec 7, 2015). "The Federal Rules of Civil Procedure recognize claims may be brought in the alternative, even if they are inconsistent." *Id.* (citing Fed. R. Civ. P. 8(d)(2), (3) ). Moreover, district courts have allowed excessive force and failure to intervene claims to proceed in the alternative beyond the summary judgment stage. *See id.* (citing *Cumberbatch v. Port Auth. of N.Y. and N.J.*, 2006 WL 3543670, at *11 (S.D.N.Y. Dec. 5, 2006) ) ("The Court will thus construe these claims as pleading in the alternative ... *i.e.*, the Officers either used excessive force, or one or both of them failed to intervene while another officer used excessive force.").

***b. Reasonable opportunity to intervene in the alleged excessive force***

In the alternative, Defendants argue that Defendant Kelly had no reasonable opportunity to intervene to prevent the alleged unauthorized use of force because the incident took place too quickly. According to Defendants, Plaintiff's interaction with Defendant Gunsalus lasted approximately 5-10 seconds before the two men went down to the ground. Defendants argue that this interaction was too brief for a reasonable jury to conclude that Defendant Kelly had a genuine opportunity to intercede.

Although it appears from the submissions to the Court that Plaintiff's interaction with Defendant Gunsalus prior to going to the ground was very brief, when viewing the facts in the light most favorable to Plaintiff, there is a genuine dispute of material fact with regard to whether or not Defendant Kelly had a reasonable opportunity to intercede during the time that the alleged excessive force was used while Plaintiff was on the ground. In his Amended Complaint, Plaintiff alleges that, "[w]hile [he] was being beaten, ... [Defendant] Kelly ... did nothing to stop him from being abused, although [he] had a reasonable opportunity to do so." *See* Amended Complaint at ¶ 15. Plaintiff also points to multiple witnesses who stated that he was struck in the ribs five to six times or possibly more and that the hitting "lasted around a minute, or a couple of minutes." *See* Dkt. No. 84, Plaintiff's Response to Defendants' Statement of Material Facts Not in Dispute, at ¶¶ 34, 39, 42. "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994) (citation omitted). There is a factual dispute regarding the amount of time Plaintiff was on the ground and who allegedly used excessive force against him during that time. Accordingly, the Court denies Defendants' motion with regard to Plaintiff's claim that Defendant Kelly failed to intervene during the time that Defendant Gunsalus was allegedly using excessive force against Plaintiff.

***c. Failure to intervene in the alleged false arrest***

Lastly, Defendants assert that, in his Amended Complaint Plaintiff's failure to intervene claim was predicated solely upon the alleged use of excessive force but that he now asserts for the first time in his response that Defendant Kelly could be found liable for failing to intervene to prevent Plaintiff's false arrest. Defendants argue that a summary judgment motion

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

is not the appropriate place to assert a new claim and that, therefore, the Court should not consider this argument.

***5** As Defendants correctly note, Plaintiff did not allege in his amended complaint that Defendant Kelly failed to intervene to prevent his allegedly false arrest, *see* Amended Complaint at ¶¶ 30-34; and he cannot raise this claim for the first time in response to Defendants' motion. *See Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (stating that the Second Circuit has held that "plaintiffs who failed to include a claim in their complaint can move to amend the complaint; if summary judgment has been granted to their opponents, they can raise the issue in a motion for reconsideration" (citing *Mauro v. S. New England Telcomms., Inc.*, 208 F.3d 384, 386 n.1 (2d Cir. 2000) ) ) "[T]he central purpose of a complaint is to provide the defendant with notice of the claims asserted against it[.]" *Id.* (citing Fed. R. Civ. P. 8(a) ). Accordingly, the Court grants Defendants' motion for partial summary judgment with regard to Plaintiff's newly raised claim that Defendant Kelly failed to intervene to prevent his allegedly false arrest.

### *2. False arrest claims against Defendant Gunsalus and Defendant Kelly pursuant to 42 U.S.C. § 1983*

A claim for false arrest under 42 U.S.C. § 1983 "derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir. 2006) (citation omitted). "In analyzing Section 1983 claims for false arrest, federal courts 'generally look to the law of the state in which the arrest occurred.' " *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 600 (E.D.N.Y. 2017) (quoting *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (quoting *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) ) ).

In order to succeed on a false arrest claim under New York law, a plaintiff must establish that " '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975) ); *see also Carpenter v. City of New York*, 984 F. Supp. 2d 255, 264 (S.D.N.Y. 2013) (stating that, "[u]nder New York state law, a claim of false arrest requires a showing that the confinement was not privileged" (citation omitted) ). "The existence of probable cause for an arrest 'is a complete defense to an action for false arrest.' " *Frederique v. Cnty. of Nassau,* 168 F. Supp. 3d 455, 476 (E.D.N.Y. 2016) (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir. 1994) ) (other citation omitted).

Defendants argue that it is undisputed that Defendant Gunsalus provided verbal commands to disperse prior to approaching Plaintiff and that Plaintiff disobeyed said commands by continuing to stand in the street conversing with his friends. Defendants also contend that, even if Plaintiff did not hear Defendant Gunsalus' commands, Defendant Gunsalus had no way of knowing that, and Plaintiff's failure to comply with his lawful and repeated verbal commands to disperse created probable cause to arrest him for disorderly conduct.

To the contrary, Plaintiff asserts that, when viewing the facts alleged in the Amended Complaint in the light most favorable to him, there is a genuine dispute as to whether Defendant Gunsalus gave verbal commands to disperse prior to his arresting Plaintiff and that, therefore, a genuine dispute as to whether there was probable cause for that arrest.

According to his submissions, multiple witnesses confirmed Plaintiff's allegations that there were no such verbal commands before the officers attempted to arrest him and, therefore, a genuine dispute exists as to whether there was probable cause to arrest Plaintiff. Accordingly, the Court denies Defendants' motion for partial summary judgment regarding Plaintiff's false arrest claims against Defendant Gunsalus and Defendant Kelly.

### *3. Malicious prosecution claims against Defendant Gunsalus and Defendant Kelly pursuant 42 U.S.C. § 1983*

***6** In order to state a sufficient claim for malicious prosecution pursuant to 42 U.S.C. § 1983, "a plaintiff must allege facts plausibly suggesting the following four elements: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as motivation for defendant's actions." *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 294 (N.D.N.Y. 2018) (citing *Ying Li v. City of New York,* F. Supp. 3d 578, 604 (E.D.N.Y. 2017) (citing *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) ) ). Moreover, the plaintiff must also allege that a Fourth Amendment right was violated resulting in " 'a sufficient post-arraignment deprivation[ ] of liberty.' " *Ying Li*, 246 F.

Supp. 3d at 604-05 (quoting *Singer*, 63 F.3d at 117) (other citation and footnote omitted).

In this case, Defendants do not dispute that the criminal proceeding terminated in Plaintiff's favor. Additionally, The Court has already addressed Defendants' argument regarding the existence of probable cause. Therefore, the Court will not address these elements here.

### *a. Initiation of a criminal proceeding*

" 'To initiate or continue a criminal proceeding, "a defendant must do more than report the crime or give testimony. He must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " " *Thomas,* 293 F. Supp. 3d at 294 (quoting *Ying Li*, 246 F. Supp. 3d at 605 (quoting *Manganiello*, 612 F.3d at 163) ). "An active role in the prosecution is inferred when a defendant ... filled out a complaining and corroborating affidavit[.]" *Ying Li,* 246 F. Supp. 3d at 605 (citing *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) (noting that a police officer can initiate prosecution by filing charges or other accusatory instruments); *Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) ).

Defendants argue that the record is devoid of proof that Defendant Kelly initiated a criminal proceeding against Plaintiff other than by assisting in the arrest. Moreover, Defendants assert that there is no evidence that Defendant Kelly swore to a criminal complaint or other accusatory instrument formally initiating prosecution as required to state a malicious prosecution claim.

However, at his deposition, Defendant Gunsalus testified that Defendant Kelly completed a supplemental report for Plaintiff's alleged crimes, "called a 19," which was submitted to the District Attorney. Defendant Gunsalus also testified that Defendant Kelly met with the prosecuting attorney regarding Plaintiff's trial. When viewing the facts in the light most favorable to Plaintiff, the Court finds that there is a material factual dispute as to whether Defendant Kelly initiated a criminal proceeding.

### *b. Actual malice*

Defendants argue that the record lacks any proof of malice. Defendants assert that probable cause existed to arrest Plaintiff; but that, even if there was a lack of probable cause, Plaintiff has failed to plead specific factual grounds regarding malice other than his conclusory allegations.

As stated above, Plaintiff asserts in his Amended Complaint that neither Defendant Gunsalus nor Defendant Kelly gave verbal commands to disperse and instantly arrested Plaintiff. Multiple witnesses corroborated these allegations. Accordingly, the Court finds that there is a material factual dispute as to whether probable cause existed and " '[a] lack of probable cause generally creates an inference of malice.' " *Ying Li,* 246 F. Supp. 3d at 614 (quoting *Manganiello*, 612 F.3d at 163); (citing *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) ("In most cases, the lack of probable cause - while not dispositive – 'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.' " (quotation omitted) ) ).

***7** Moreover, Plaintiff asserts that, although he did not resist arrest or touch Defendants Gunsalus and Kelly, they violently beat him. " '[M]alice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff.' " *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) (quotation and other citation omitted)*; see also* *TADCO Constr. Corp. v. Dormitory Auth. of State of New York*, 700 F. Supp. 2d 253, 271 (E.D.N.Y. 2010) (stating that "[a]ctual malice requires pleading facts that show the defendant 'commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served' " (quotation omitted) ). When viewing the facts in the light most favorable to Plaintiff, the Court finds that there is an issue of fact as to whether Defendants Gunsalus and Kelly undertook the criminal proceedings unlawfully and with wrongful motives.

### *c. Post-arraignment deprivation of liberty*

Lastly, Defendants argue that Plaintiff was released on his own recognizance within hours of his arrest and, therefore, has failed to demonstrate a post-arraignment deprivation of liberty. Defendants assert that, aside from the bare assertion that he was "forced to appear in Court numerous times over slightly less than a year," there is no specific information as to the number of appearances or whether there were any court-imposed restrictions on his liberty.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

The Court disagrees. A defendant released pretrial has still suffered a post-arraignment deprivation of liberty. *See Murphy v. Lynn,* 118 F.3d 938, 946 (2d Cir. 1997) (citing *Albright v. Oliver*, 510 U.S. 266, 114 S. Ct. 807 (1994) ). A defendant released pretrial "is scarcely at liberty; he remains apprehended, arrested in his movements, indeed 'seized' for trial, so long as he is bound to appear in court and answer the state's charges." *Id.* (quotation omitted). Accordingly, the Court denies Defendants' motion for partial summary judgment with regard to Plaintiff's malicious prosecution claims against Defendant Gunsalus and Defendant Kelly.

***4. Denial of the right to a fair trial claims against Defendant Gunsalus and Defendant Kelly pursuant to 42 U.S.C. § 1983***

"The claim of denial of the right to a fair trial due to fabricated evidence stems from the Sixth Amendment and the Due Process clauses of the Fifth, Sixth, [and] Fourteenth Amendments of the U.S. Constitution." *Ying Li,* 246 F. Supp. 3d at 627 (citing *Holbrook v. Flynn*, 475 U.S. 560, 106 S. Ct. 1340, 89 L.Ed. 2d 525 (1986) ) (other citation omitted); *see also Jeanty v. City of Utica*, No. 16-CV-0966, 2017 WL 6408878, *3 (N.D.N.Y. Aug. 18, 2017) (Sannes, J.) (finding that denial of the right to a fair trial through the creation of fabricated evidence forwarded to the prosecutor is properly a claim for denial of procedural due process). "Fabrication of evidence constitutes a violation of the right to a fair trial." *Thomas,* 293 F. Supp. 3d at 295 (citation omitted). "[T]here is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty." *Zahrey v. Coffey,* 221 F.3d 342, 344 (2d Cir. 2000).

"To state a claim of fabrication of evidence, a plaintiff must allege that 'an (1) investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result.' " *Ying Li,* 246 F. Supp. 3d at 628 (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016) ). "Probable cause is not a defense to a fabrication-of-evidence claim." *Tanner v. Humphries*, No. 6:16-CV-1131 (GTS/TWD), 2019 WL 981863, *17 (N.D.N.Y. Jan. 3, 2019) (Suddaby, C.J.) (citing *Jovanovic*, 486 F. App'x at 152).

***8** " 'The Fourteenth Amendment does not protect against all deprivations of liberty[;] [i]t protects only against deprivations of liberty accomplished "without due process of law.' " " *Id.* at *19 (quoting *Baker v. McCollan*, 443 U.S. 137, 145 (1970) ); (citing *Threat v. Russi*, 784 F. Supp. 65, 68 (W.D.N.Y. 1992) ("Thus, the plaintiff would only suffer a constitutional violation of his fourteenth amendment rights if he did not receive adequate procedural protection upon being accused, falsely or not, of wrongdoing.") ). Furthermore, "courts have recognized that a plaintiff 'need not have been convicted or suffer a post-conviction deprivation of liberty in order to state a valid § 1983 claim; fabrication of evidence leading to pre-trial detention can satisfy the causation element of a fair trial claim.' " *Id.* (quoting *Long*, 2016 WL 4203545, at *5 (finding that an overnight detention pending arraignment due to the allegedly false information, arrest report, and criminal complaint satisfied the requirement that there be a deprivation of liberty) ).

In this case, Plaintiff was detained until after his arraignment, at which time he was released on his own recognizance. However, Plaintiff has not shown that he lacked an adequate post-deprivation remedy. "[T]he Second Circuit has stated that, '[w]hen the state conduct is random and unauthorized, the state satisfies procedural due process requirements so long as it provides [a] meaningful post-deprivation remedy.' " *Tanner*, 2019 WL 981863, at *19 (quoting *Rivera-Powell v. New York City Bd. of Elecs.*, 470 F.3d 458, 465 (2d Cir. 2006) ); (citing *Zinermon v. Burch*, 494 U.S. 113, 132 (1990) (noting that, "[i]n situations ... where the State is truly unable to anticipate and prevent a random deprivation of a liberty interest, postdeprivation remedies might satisfy due process") ). Furthermore, as the court noted in *Tanner*, "[a]t least one court has found that an officer's decision to arrest a plaintiff 'without probable cause and fabricate evidence against him is the archetype of "random and unauthorized intentional conduct.' " " *Id.* (quoting *Maldonado v. City of New York*, 11-CV-3514, 2014 WL 787814, at *11 (S.D.N.Y. Feb. 26, 2014) ); (citing *Salem v. City of New York*, 17-CV-4799, 2018 WL 3650132, at *6 (S.D.N.Y. Aug. 1, 2018) (finding that failure of corrections officers to adhere to official guidelines was a random and unauthorized act) ).

Applying these principles to this case, the Court finds that Plaintiff's allegations that Defendant Gunsalus and Kelly falsified evidence falls into the category of a random and unauthorized action and that, therefore, Plaintiff must show that he lacked a meaningful post-deprivation remedy. This he clearly cannot do because, as the court in *Tanner* explained, "courts have held that the ability to sue for tort claims such as false arrest and malicious prosecution under [42] U.S.C.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

§ 1983 provide such remedy." *Tanner*, 2019 WL 981863, at *19 (citing *Moldonado*, 2014 WL 787814, at *11; *Malik v. City of New York*, 11-CV-6062, 2012 WL 3345317, at *11 (S.D.N.Y. Aug. 15, 2012), *adopted*, 2012 WL 4475156 (Sept. 28, 2012) (finding that "New York provides such an adequate post-deprivation remedy in the form of state law causes of action for negligence ..." related to destruction of property by a state employee) ). Since, in this case, Plaintiff has relied, at least in part, on the alleged falsifications as a basis for his false arrest and malicious prosecution claims, the Court finds that his "ability to pursue such claims provides an adequate post-deprivation remedy for any deprivation of liberty" that he may have suffered, *see Tanner*, 2019 WL 981863, at *19, and, therefore, grants Defendants' motion for partial summary judgment with regard to Plaintiff's denial of his right to a fair trial claims against Defendants Gunsalus and Kelly.

***5. Qualified immunity defense with regard to Plaintiff's false arrest and malicious prosecution claims against Defendant Gunsalus and Defendant Kelly***

***9** "Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18, 102 S. Ct. 2727, 73 L.Ed. 2d 396 (1982) ). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738) (other citation omitted). "As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) 'whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation'; and (2) 'whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation confronted.' " *Thomas,* 293 F. Supp. 3d at 300 (quoting *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 2004) ) (other citation omitted).

Moreover, "[e]ven when probable cause for arrest did not exist, an officer is entitled to qualified immunity if he can show that there was 'arguable probable cause' for the arrest." *Crenshaw v. City of Mount Vernon*, 372 F. App'x 202, 205 (2d Cir. 2010) (summary order). " 'Arguable probable cause ... exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law.' " *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (internal quotation marks omitted) (emphasis in original) ). When determining whether arguable probable cause existed, courts must determine whether " '(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' " *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Golino*, 950 F.2d at 870) (other citations omitted).

In their motion for partial summary judgment, Defendants argue that, if the Court finds that probable cause did not exist to arrest Plaintiff, Defendants Gunsalus and Kelly are still entitled to qualified immunity based on a theory of "arguable probable cause." As discussed above, Plaintiff has sufficiently stated a claim for false arrest and malicious prosecution pursuant to 42 U.S.C. § 1983 against Defendant Gunsalus and Defendant Kelly. Furthermore, when viewing the facts in the light most favorable to Plaintiff, the Court finds that he has sufficiently alleged facts creating a genuine dispute as to whether Defendant Gunsalus gave verbal commands and, therefore, lacked probable cause. If Defendant Gunsalus failed to make verbal commands to disperse and Defendant Kelly was aware of this, it would be objectively unreasonable for either of them to believe probable cause existed. Plaintiff has "the right to be free from arrest without probable cause" and it would not be reasonable for a police officer to arrest someone without probable cause. *Schwartz v. Marcantonatos,* 567 F. App'x 20, 22-23 (2d Cir. 2014) (summary order). Accordingly, the Court denies Defendants' motion for partial summary judgment based on the defense of qualified immunity.

## IV. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that all of Plaintiff's claims against the "unidentified officers" are **DISMISSED *sua sponte***; and the Court further

**ORDERS** that Defendants' motion for partial summary judgment regarding all of Plaintiff's failure to intervene claims

against Defendant Gunsalus and his failure to intervene claims regarding malicious prosecution, false arrest, and denial of his right to a fair trial against Defendant Kelly, *see* Dkt. No. 80, is **GRANTED**; and the Court further

***10 ORDERS** that Defendants' motion for partial summary judgment with regard to Plaintiff's illegal seizure of his property claims against Defendants Gunsalus and Kelly, *see* Dkt. No. 80, is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion for partial summary judgment with regard to Plaintiff's municipal liability claim against Defendant City of Syracuse, *see* Dkt. No. 80, is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion for partial summary judgment with regard to Plaintiff's claims of a denial of his right to a fair trial against Defendants Gunsalus and Kelly, *see* Dkt. No. 80, is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion for partial summary judgment with regard to Plaintiff's failure to intervene in the use of excessive force claim against Defendant Kelly, *see* Dkt. No. 80, is **DENIED**; and the Court further

**ORDERS** that Defendants' motion for partial summary judgment with regard to Plaintiff's claims of false arrest and malicious prosecution against Defendants Gunsalus and Kelly, *see* Dkt. No. 80, is **DENIED**; and the Court further

**ORDERS** that Defendants' motion for partial summary judgment based on the defense of qualified immunity *see* Dkt. No. 80, is **DENIED**; and the Court further

**ORDERS** that the trial of the remaining claims in this action shall commence at **10:00 a.m.** on **July 8, 2019,** in **Syracuse, New York**. [6]

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1410348

## Footnotes

1 The parties stipulated to the dismissal of the claims against Police Officers William Lashomb and Joseph Mauro; and the Court "so ordered" that stipulation on October 2, 2017. *See generally* Dkt. Nos. 68-69. Accordingly, "the individual defendants" refers only to Defendant Gunsalus and Defendant Kelly. Furthermore, despite the completion of discovery, Plaintiff has failed to identify the "Unidentified Syracuse Police Officers"; therefore, the Court dismisses Plaintiff's claims against the Unidentified Syracuse Police Officers *sua sponte.*

2 Defendants did not move for summary judgment with regard to Plaintiff's excessive force claims against Defendants Gunsalus and Kelly.

3 In response to Defendants' motion, Plaintiff voluntarily dismissed his illegal seizure of his property claim against Defendants Gunsalus and Kelly and his *Monell* claim against Defendant City of Syracuse. *See* Dkt. No. 83, Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment, at 4, 13. Accordingly, the Court grants Defendants' motion for partial summary judgment with regard to these causes of action.

4 Plaintiff has alleged that Defendants Gunsalus and Kelly were acting under color of state law, and Defendants do not challenge this assertion.

5 Plaintiff concedes that Defendant Gunsalus was the arresting officer and a direct participant in the alleged constitutional violations and, therefore, withdraws his failure to intervene claims against Defendant Gunsalus. *See* Dkt. No. 83, Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Partial Summary

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Judgment, at 6. Plaintiff also withdraws his failure to intervene claims as to his malicious prosecution and denial of the right to a fair trial because Defendant Kelly is a direct participant in those claims. *See id.* at 7. Accordingly, the Court grants Defendants' motion with regard to these claims.

6 The following claims remain for trial: (1) excessive force against Defendant Gunsalus and Defendant Kelly; (2) failure to intervene in the use of excessive force against Defendant Kelly; (3) false arrest against Defendant Gunsalus and Defendant Kelly; and (4) malicious prosecution against Defendant Gunsalus and Defendant Kelly.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 2350153
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

JUSTIN JONES, Plaintiff,
v.
DALE A. BUCK, JR., also known as John Doe #1 State Police Officer K-9 Handler, and THOMAS A. GIANNETTINO, also known as John Doe #2 State Police Officer, Defendants.

5:22-cv-1188 (ECC/ML)
|
Filed 08/13/2026

**Attorneys and Law Firms**

Justin Jones, pro se Plaintiff

Aimee Cowan, Asst. Att'y General, for Defendants

Justin Jones, Napanoch, NY, Pro Se.

Aimee Cowan, Patrick R. Blood, Office of the Attorney General, Syracuse, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Elizabeth C. Coombe U.S. District Judge

***1** Pro se plaintiff Justin Jones brings this action pursuant to 42 U.S.C. § 1983 against Defendants Dale A. Buck, Jr. and Thomas A. Giannettino, asserting claims for excessive force and failure to intervene in violation of his Fourth Amendment rights. Dkt. No. 1 (Complaint). Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Dkt. No. 72. The motion is fully briefed. *See* Dkt. Nos. 73, 79, 84. For the following reasons, Defendants' motion for summary judgment is denied.

## I. BACKGROUND [1]

On February 24, 2021, Plaintiff and his girlfriend, Stacy Earl, were using controlled substances together and arguing. Dkt. No. 72-3 ¶ 1; Dkt. No. 72-5 at 34, 37-38. As of that date, Ms. Earl had an Order of Protection against Plaintiff in place. Dkt. No. 72-3 ¶ 2. Plaintiff and Ms. Earl continued arguing that evening while at Walmart in Auburn, New York and, at some point, Ms. Earl exited the vehicle and ran into a Kwik Fill gas station, where she called the police. *Id.* at ¶¶ 10-13. [2]

Plaintiff left the Kwik Fill but later returned. *Id.* at ¶ 19. As he returned, Plaintiff saw a police vehicle at the Kwik Fill and, knowing that he did not have a valid driver's license, continued driving by. *Id.* at ¶ 20; Dkt. No. 72-5 at 48. Officers from the Auburn Police Department (APD) began following Plaintiff. Dkt. No. 72-3 at ¶¶ 22, 25, 27-29. At approximately 11:23 p.m., Defendant New York State Trooper Thomas Giannettino was notified via 911 dispatch that APD officers had responded to a Kwik Fill gas station and that Plaintiff had been identified "as the suspect in a domestic dispute that took place" there. Dkt. No. 72-15 ¶ 5. The dispatch further stated that Plaintiff had fled the scene in a Chevrolet Trail Blazer with a dealer license plate. *Id.* Trooper Giannettino thereafter observed this vehicle and proceeded to follow it in his patrol vehicle. *Id.* at ¶ 6. Trooper Giannettino observed the vehicle drive through a red light; a "vehicle pursuit was initiated" that lasted approximately "15.4 miles" and "25 minutes." *Id.*

At approximately 11:40 p.m., Defendant New York State Trooper Dale Buck, Jr. responded to "assist" Trooper Giannettino with the vehicle pursuit. Dkt. No. 72-12 ¶ 7. Trooper Buck was aware from the 911 dispatcher that the "operator of the vehicle was involved in a domestic incident and that the Auburn Police Department was investigating." *Id.* at ¶ 7. APD informed patrol officers that the suspect was Plaintiff, and that Plaintiff "violated a full stay away order of protection and may be in possession of a knife." *Id.* at ¶ 8.

***2** The Cayuga County Sheriff's Office deployed "spike strips" on two occasions during the vehicle pursuit, eventually deflating all four tires on Plaintiff's vehicle. Dkt. No. 72-15 ¶ 7. According to Trooper Giannettino, Plaintiff reached speeds over 80 miles per hour prior to deployment of the spike strips. *Id.* Plaintiff, however, asserts that he was going "about thirty miles an hour" and "wasn't trying to do a high-speed chase." Dkt. No. 72-5 at 57. Plaintiff continued driving on the deflated tires for a few minutes but eventually stopped the car and "veer[ed] off the road into the snowbank." *Id.* at 61-63. This occurred on State Route 34B in the Town of Scipio, a rural and unlit area. Dkt. No. 72-3 ¶¶ 54, 64.

The parties dispute what occurred after Plaintiff's vehicle went off the road. According to Plaintiff, he got out of the SUV through the passenger side door as soon as it stopped and "ran." Dkt. No. 72-5 at 65-66. Plaintiff made it about "fifteen feet" from the car before he "couldn't run" anymore in the

foot-deep snow. *Id.* at 66; *see id.* at 72 (testifying he made it ten feet from the car). At this point officers told Plaintiff to stop, but he was "already stopped." *Id.* at 72. Plaintiff heard the officers tell him to stop or "[they're] going to let the canine go" three times and, although Plaintiff was "already not even moving," they "let the dog go." *Id.* at 74, 75. The officers "let [the dog] sit there and bite [his] leg," resulting in fourteen bite marks on his left leg. *Id.*; *see id.* at 81 ("[T]hey literally watched the dog bite me."). Plaintiff testified that the dog continued biting him and an officer continued "kneeling on [his] back" even after he was handcuffed. *Id.* at 84, 90. Plaintiff testified that a trooper "lift[ed] [his] knee back up and then put[ ] [his] weight back down" two or three times, resulting in a "bruise on [Plaintiff's] side." *Id.* at 91-92.

Trooper Buck asserts that, once Plaintiff's vehicle came to a stop off the road, he retrieved his partner, K-9 Rylo, and "began giving verbal commands to plaintiff while he was still located inside the stopped vehicle." Dkt. No. 72-12 ¶ 9. Trooper Buck announced himself as NYSP Canine and directed Plaintiff to show his hands, otherwise Trooper Buck would release the K-9. *Id.* Plaintiff "disregarded these commands" and exited the vehicle from the passenger side "with a dark, unidentified object in his hand." *Id.*; *accord* Dkt. No. 72-15 ¶ 8; *see also* Dkt. No. 72-5 at 69-70 (Plaintiff testifying that he may have had a flashlight or "black bag of needles" in his hand or pocket when he exited the car). Trooper Buck commanded Plaintiff to drop the object and not move, but Plaintiff "failed to comply" and ran from the vehicle into the snow-covered field. Dkt. No. 72-12 ¶ 9. Trooper Giannettino also gave Plaintiff "verbal commands to stop running and to show [ ] his hands." Dkt. No. 72-15 ¶ 8. Trooper Buck "again gave 'State Police Canine Announcements,' " during which he directed Plaintiff to show his hands and stop running, otherwise the K-9 would be released. Dkt. No. 72-12 ¶ 10. Because Plaintiff failed to comply, Trooper Buck "released K-9 Rylo, who ran approximately 25-30 yards and apprehended plaintiff." *Id.*

K-9 Rylo initially engaged Plaintiff on his left thigh. Dkt. No. 72-3 ¶ 82. According to Trooper Buck, Plaintiff fell to the ground and rolled over, placing K-9 Rylo's "neck in an awkward position" and so, in accordance with his training, K-9 Rylo "disengaged from plaintiff's thigh and reengaged on plaintiff's left calf." Dkt. No. 72-12 ¶ 11 (explaining that K-9 Rylo was trained and required to "maintain his hold on the suspect until the suspect is handcuffed and no longer a threat").[3] It took "approximately 25-30 seconds for K-9 Rylo to apprehend plaintiff and for Trooper Buck to arrive at their location in the field," at which point Trooper Buck determined that the object in Plaintiff's hand was a flashlight and removed it. Dkt. No. 72-3 ¶¶ 85-87.

***3** Trooper Giannettino handcuffed Plaintiff and patted him down to ensure he did not have any weapons. Dkt. No. 72-15 ¶ 10. Trooper Giannettino does "not recall" whether he placed his knee on Plaintiff's back but asserts that it would have been within NYSP policy to do so to ensure Plaintiff could be handcuffed. *Id.* According to Defendants, K-9 Rylo was "immediately disengaged" once Plaintiff was "handcuffed and no longer a threat." Dkt. No. 72-12 ¶ 12; Dkt. No. 72-15 ¶ 10.

Plaintiff was then transported to the hospital for treatment and received approximately "seventy to eighty staples and nine stitches" in his left leg. Dkt. No. 72-5 at 95-96.

## II. LEGAL STANDARD

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also* *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also* *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to " 'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also* *Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255,

266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

***4** Where the plaintiff proceeds pro se, the Court must "read his submissions liberally and interpret them 'to raise the strongest arguments that they suggest.' " *Hennessy v. Aiossa*, No. 19-cv-1027 (BKS/DJS), 2021 WL 3792966, at *3 (N.D.N.Y. Aug. 26, 2021) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)). However, a "pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Id.* (citations omitted).

## III. DISCUSSION

On initial review, Plaintiff's Complaint was construed to assert claims under the Fourth Amendment for excessive force and failure to intervene against Defendants. *See* Dkt. Nos. 10, 12. Defendants move for summary judgment on all of Plaintiff's claims.

### A. Plaintiff's Failure to Respond to Defendants' Statement of Material Facts

In support of their motion for summary judgment, Defendants submitted a Statement of Material Facts Not in Dispute in accordance with Local Rule 56.1. Dkt. No. 72-3. Defendants also notified Plaintiff of the consequences of failing to respond to a summary judgment. Dkt. No. 72-1. This notification advised Plaintiff that he was required to respond to Defendants' statement of material facts and that, if he did not, the Court may deem Defendants' factual statements to be true. *Id.* Plaintiff filed a five-page handwritten opposition to Defendants' motion, along with some documentary support, but did not separately respond to Defendants' statement of material facts. *See* Dkt. No. 79; Local Rule 56.1(b). Defendants therefore request that the Court deem the facts in their statement "as admitted." Dkt. No. 84 at 5-7.

Local Rule 56.1 provides that the Court "may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." Local Rule 56.1(b) (underlining omitted). Thus, where a party fails to respond to the movant's statement of material facts, the Court may accept those facts as true to the extent they are supported by evidence in the record, and the nonmovant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion. *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). The Court has "broad discretion" in determining whether to overlook a "failure to comply with local rules," and has the discretion to "conduct an assiduous review of the entire record even where one of the parties has failed to file [a Rule 56.1] statement." *Curtis v. Bola*, No. 15-cv-718 (GLS/TWD), 2016 WL 7735755, at *7 (N.D.N.Y. Nov. 1, 2026) (citations omitted), *report and recommendation adopted*, 2017 WL 120945 (N.D.N.Y. Jan. 12, 2017). In deference to Plaintiff's pro se status, the Court has opted to review the entire summary judgment record, which includes Plaintiff's deposition testimony, to determine if there are material facts in dispute.

### B. Excessive Force

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis omitted). Whether the force used by an arresting officer was excessive is determined by an objective balancing test where "the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests" is balanced "against the countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citation omitted).

***5** At least three factors guide this determination: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Graham*, 490 U.S. at 396). This requires analysis of the totality of the circumstances, and the "history of the

interaction, as well as other past circumstances known to the officer ... may inform the reasonableness of the use of force.” *Barnes v. Felix*, 605 U.S. 73, 80-81 (2025).

Nonetheless, “[t]he ‘reasonableness’ of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” *Graham*, 490 U.S. at 396. Moreover, “[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.” *Id.* at 396-97. “Such calculus accounts for the well-worn axiom that ‘[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.’ ” *White v. LaRusch*, No. 18-cv-1245, 2022 WL 4287661, at *9 (W.D.N.Y. June 1, 2022), *report and recommendation adopted*, 2022 WL 3655184 (W.D.N.Y. Aug. 25, 2022) (quoting *Graham*, 490 U.S. at 396).

“Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers’ conduct was objectively unreasonable.” *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (citation omitted).

### 1. Trooper Buck

Defendants argue that Trooper Buck is entitled to summary judgment on Plaintiff's excessive force claim because it was objectively reasonable for Trooper Buck to deploy K-9 Rylo to secure Plaintiff's apprehension and continue K-9 Rylo's engagement until Plaintiff was handcuffed, and because Trooper Buck is entitled to qualified immunity. Dkt. No. 72-2 at 14-20. Plaintiff's opposition, read liberally and interpreted to raise the strongest arguments it suggests, disputes certain of Defendants’ factual assertions and contends that (1) Plaintiff never rolled over or moved onto K-9 Rylo; (2) Defendants never stated that Trooper Buck fell and injured himself before he reached Plaintiff, which may explain why K-9 Rylo was allowed to continue biting him; (3) Plaintiff “was in handcuffs while [K-9 Rylo] was still chewing on his leg;” and (4) K-9 Rylo was “chewing” and not merely “hold[ing]” his leg. *See* Dkt. No. 79. [4]

The Court concludes that genuine disputes of material fact preclude summary judgment in Trooper Buck's favor on Plaintiff's excessive force claim. It is undisputed that Defendants had been informed that Plaintiff had been involved in a “domestic incident,” had “violated a full stay away order of protection,” and “may be in possession of a knife.” Dkt. No. 72-12 ¶¶ 7-8; Dkt. No. 72-15 ¶ 5. They were also aware that Plaintiff had led multiple law enforcement agencies on a vehicle pursuit lasting more than 15 miles, requiring spike strips to eventually disable his vehicle. *See* Dkt. No. 72-3 ¶¶ 29-54. Defendants also assert that they observed Plaintiff with a dark object in his hand when he exited the vehicle, *id.* at ¶ 60, although Plaintiff's testimony is equivocal on that point. These facts may, as Defendants contend, weigh in favor of finding Trooper Buck's use of force objectively reasonable. But Plaintiff's version of events diverges from Defendants’ version in two crucial respects.

***6** First, Plaintiff testified at his deposition that he made it approximately 10 to 15 feet from his vehicle before he “couldn't run” in the snow anymore and “stopped.” Dkt. No. 72-5 at 66; *see id.* at 72-73 (testifying that the Troopers told him to stop but he “was already stopped”). [5] Thus, viewing the evidence in the light most favorable to Plaintiff as the non-movant, a jury could reasonably conclude that he had ceased fleeing from officers before Trooper Buck released K-9 Rylo. Second, the parties dispute the length of time K-9 Rylo was deployed on Plaintiff. According to Defendants, it “took approximately 25-30 seconds for K-9 Rylo to apprehend plaintiff and for Trooper Buck to arrive at their location” and K-9 Rylo was “immediately disengaged” once Plaintiff was “handcuffed and no longer a threat.” *See* Dkt. No. 72-3 ¶¶ 85, 89. But Plaintiff testified repeatedly that K-9 Rylo continued biting his leg even after he was handcuffed and that this lasted for a period of minutes. *See, e.g.*, Dkt. No. 72-5 at 74 (“[T]hey literally let [K-9 Rylo] sit there and bite my leg.”), 82 (testifying that K-9 Rylo disengaged “[o]nce they picked [him] up”), 84 (“I was still in handcuffs ... while the dog [was] still biting me.”), 85 (“[T]he dog was still biting me while I'm in handcuffs.”), 90 (“I was in handcuffs fast.... [A]fter I was in handcuffs, that's when the dog started biting me more and more and more and more.”), 91 (testifying that “probably at least four or five minutes” passed from being put into handcuffs until he was stood up). Plaintiff asserts that he had fourteen bite marks on his left leg and received “seventy to eighty staples and nine stitches.” *Id.* at 74, 75, 95-96. Defendants fail to address Plaintiff's account, which he raised in opposition, *see* Dkt. No. 79 at 3, 5, or the extent of his injuries.

Defendants have not cited authority which supports their entitlement to judgment as a matter of law on the excessive force claim against Trooper Buck on Plaintiff's facts, and the cases they cite are distinguishable. Defendants cite *Nuzzo v. Devine*, where the court concluded that the deployment by two troopers (who were not defendants) of their police dogs to apprehend the plaintiff was not objectively unreasonable. 494 F. Supp. 3d 232, 237 (D. Conn. 2020). But *Nuzzo* was decided after a bench trial, and the court expressly found the facts to be those "adduced by the testimony of the defendants and their witnesses." *Id.* at 236. At summary judgment the Court may not resolve factual disputes or weigh the parties' credibility. *See also Fink v. Catalano*, No. 20-cv-344 (TJM/TWD), 2023 WL 2346266, at *5 (N.D.N.Y. Mar. 3, 2023) (holding, on unopposed summary judgment motion, that use of police dog to bring the plaintiff to the ground and immediately disengaging the dog was objectively reasonable where the plaintiff "actively refuse[d] arrest and engage[d] in threatening behavior" and "disregarded clear warnings").

Indeed, courts routinely deny motions for summary judgment on excessive force claims where the parties dispute what occurred, including in situations involving the deployment of police dogs. In *George v. Town of East Hartford*, for example, the plaintiff testified that at least two officers were punching him before he "felt a dog bite his leg" and that, when the plaintiff succumbed to the pain and blood loss, the dog "was allowed to continue to bite him even though he offered no further resistance." No. 97-cv-1958, 2000 WL 436605, at *1 (D. Conn. Mar. 13, 2000). The officers, by contrast, asserted that "the dog was ordered to release the plaintiff as soon as [an officer] was able to handcuff him." *Id.* at *1 n.2. Accepting the plaintiff's version of facts as true, the court concluded that a jury could reasonably return a verdict for him on his excessive force claims and denied summary judgment. *Id.*; *see also Gonzalez v. City of Rochester*, No. 16-cv-6652, 2020 WL 5032026, at *7 (W.D.N.Y. Aug. 26, 2020) (denying summary judgment on excessive force claim where there were "stark issues of fact concerning [the officer's] release of the dog, and the events that ensued immediately thereafter"); *Raffone v. Nugent*, No. 13-cv-1589, 2016 WL 199399, at *4 (D. Conn. Jan. 15, 2016) (denying summary judgment on excessive force claim where there was a "genuine issue of fact regarding the circumstances under which the order to attack was given" to the police dog); *Smith v. P.O. Canine Dog Chas*, No. 02-6240, 2004 WL 2202564, at *13 (S.D.N.Y. Sept. 28, 2004) (finding a material issue of fact as to the reasonableness of a canine handler's actions in "light of [the plaintiff's and the officer's] substantially different versions of events").

***7** Trooper Buck also argues that, in the alternative, he is entitled to qualified immunity. "When a plaintiff shows facts making out a violation of a constitutional right, a defendant may establish the affirmative defense of qualified immunity by demonstrating that (1) the right was not 'clearly established' or (2) even if the right was 'clearly established,' 'it was objectively reasonable for the officer to believe the conduct at issue was lawful.' " *Elder v. McCarthy*, 967 F.3d 113, 131 (2d Cir. 2020) (citation omitted). Officers "receive qualified immunity unless they could have 'read' the relevant precedent beforehand and 'know[n]' that it proscribed their specific conduct." *Zorn v. Linton*, 607 U.S. ---, 146 S. Ct. 926, 930 (2026) (citation omitted). To demonstrate entitlement to summary judgment based on qualified immunity, a defendant must:

> adduce[ ] sufficient facts such that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[ ], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (brackets and internal quotation marks omitted) (citing *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1997)). "Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Bell v. Saunders*, No. 20-cv-256 (BKS/TWD), 2024 WL 5078136, at *8 (N.D.N.Y. Dec. 11, 2024) (quoting *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)).

Here, in light of the genuine disputes of material fact that are relevant to assessing the reasonableness of Trooper Buck's conduct, including whether Plaintiff had stopped fleeing before K-9 Rylo was released and whether K-9 Rylo continued biting Plaintiff after he was handcuffed, Trooper Buck has not demonstrated his entitlement to qualified immunity at this stage. *See, e.g.*, *Smith*, 2004 WL 2202564, at *14 (concluding that canine officer would not be entitled to

qualified immunity on excessive force "for the same reasons" he would not be entitled to summary judgment on the merits). No reasonable officer could have believed that allowing K-9 Rylo to "chew" Plaintiff's legs for minutes after he was handcuffed and no longer a threat was lawful.[6]

Accordingly, Trooper Buck is not entitled to summary judgment on Plaintiff's excessive force claim.

### 2. Trooper Giannettino

Defendants argue that Trooper Giannettino is entitled to summary judgment on Plaintiff's excessive force claim because Plaintiff cannot positively identify which officer placed a knee on his back and because the amount of force used was *de minimis* and otherwise not unreasonable as a matter of law. Dkt. No. 72-2 at 20-26. Plaintiff's opposition mentions a "knee in [his] back pushing down" but otherwise does not address the excessive force claim against Trooper Giannettino. Dkt. No. 79 at 5. Even to the extent Plaintiff's opposition could be read to not address Defendants' arguments with respect to the excessive force claim against Trooper Giannettino, in light of his pro se status, the Court nonetheless must "examine every claim ... with a view to determining whether summary judgment is legally and factually appropriate." *Jackson v. Federal Exp.*, 766 F.3d 189, 198 (2d Cir. 2014). Upon review of the summary judgment record, the Court concludes that factual disputes preclude summary judgment in Trooper Giannettino's favor on the excessive force claim.

***8** As an initial matter, it is not necessarily the case that Plaintiff must positively identify which officer allegedly used excessive force against him to defeat a summary judgment motion. *See John v. City of New York*, 406 F. Supp. 3d 240, 245 (E.D.N.Y. 2017) (citations omitted). Rather, because he alleges that more than one officer was involved in his arrest, he "need only produce evidence that the Officer Defendants were present on the night in question and participated in his arrest." *Id.* (citations omitted). Here, it is undisputed that Trooper Giannettino was present, involved in Plaintiff's arrest, and the officer who handcuffed Plaintiff. *See* Dkt. No. 72-3 ¶ 88; *see also* Dkt. No. 72-5 at 80 (Plaintiff testifying that he does not think APD officers "even stepped out in the field"). Accordingly, Trooper Giannettino is not entitled to summary judgment on this basis.

Although Defendants characterize the force at issue as "a knee placed on plaintiff's back while he was being handcuffed," *e.g.*, Dkt. No. 72-2 at 21, Plaintiff testified at his deposition that the officer had a knee on his back for a "good two minutes" *after* Plaintiff was already handcuffed. Dkt. No. 72-5 at 89 ("I don't know why he had to kneel on my back when I'm already in handcuffs."). Plaintiff further asserts that the officer was "letting pressure off, putting pressure back on" with his knee two or three times and that he had a bruise on his side afterwards. *Id.* at 91, 92. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that this use of force, which occurred after Plaintiff was secured and while a police dog was engaged on his leg, was entirely gratuitous and therefore objectively unreasonable. Courts in this Circuit "have concluded that 'even a minor use of force' is unreasonable when a suspect has already been restrained or handcuffed" and thus deny summary judgment where a plaintiff "alleges that he was subject to unnecessary force such as 'yanking' an arm after he or she was restrained in handcuffs." *Scoma v. City of New York*, No. 16-cv-6693, 2021 WL 230295, at *10 (E.D.N.Y. Jan. 22, 2021) (citations omitted); *see also McClendon v. County of Nassau*, No. 11-cv-190, 2012 WL 4849144, at *9 (E.D.N.Y. Oct. 11, 2012) ("Unnecessary blows inflicted while an arrestee is in handcuffs may be sufficient to sustain an excessive force claim.") (collecting cases); *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) ("[W]e have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked her' and threw her up against a car, causing only bruising.").

To the extent Defendants argue that Plaintiff's excessive force claim against Trooper Giannettino fails as a matter of law because Plaintiff suffered only the *de minimis* injury of bruising, the Court disagrees. It is well-established that, "although the absence of significant injury is relevant to the question of excessive force, it is not dispositive under a Fourth Amendment analysis." *Jones v. Treubig*, 963 F.3d 214, 239 (2d Cir. 2020) (citations omitted); *see also Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010) (noting, in Eighth Amendment context, that excessive force claims must be decided "based on the nature of the force rather than the extent of the injury"). Furthermore, "district courts within the Second Circuit have held that force that merely causes *de minimis* injury can be excessive if 'gratuitous.' " *Jarvis v. Knapp*, No. 25-cv-1167 (MAD/MJK), 2026 WL 1139372, at *4 (N.D.N.Y. Apr. 28, 2026) (citation omitted).[7]

***9** Finally, Trooper Giannettino has not demonstrated his entitlement to qualified immunity at this stage. Although Defendants argue that a "reasonable officer in [his] circumstances could have determined that the challenged conduct, placing a knee on a fleeing suspect's back while handcuffing [him], was lawful," Dkt. No. 72-2 at 25, they do not address qualified immunity as it relates to the alleged use of gratuitous and unnecessary force after Plaintiff was handcuffed. *See* *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020) (noting the "well established principle that the use of entirely gratuitous force is unreasonable and therefore excessive") (quoting *Tracy*, 623 F.3d at 99 n.5) (internal quotation marks omitted).

Accordingly, Trooper Giannettino is not entitled to summary judgment on Plaintiff's excessive force claim.

### C. Failure to Intervene

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Sloley v. VanBramer*, 945 F.3d 30, 46-47 (2d Cir. 2019) (citation omitted). To establish a claim for failure to intervene, a plaintiff must show that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Williams v. DiPuccio*, No. 19-cv-995 (BKS/MJK), 2024 WL 1765558, at *3 (N.D.N.Y. Apr. 24, 2024) (citation omitted). "Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.' " *Sloley*, 945 F.3d at 47 (quoting *Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014)).

Defendants argue as a threshold matter that the failure to intervene claims should be dismissed because they cannot be liable both for using excessive force and for failing to prevent that use of excessive force. Dkt. No. 72-2 at 27. Although this is correct, the Federal Rules of Civil Procedure "recognize both that a party may 'set out two or more statements of a claim ... alternatively' and that '[a] party may state as many claims ... as it has, regardless of consistency' between them." *Watson v. City of Kingston-Kingston Police Dep't*, No. 15-cv-1356 (BKS/DEP), 2018 WL 4509488, at *4 (N.D.N.Y. Sept. 19, 2018) (quoting Fed. R. Civ. P. 8(d)(2), (3)). District courts therefore "have allowed excessive force and failure to intervene claims to proceed in the alternative beyond the summary judgment stage." *Franco v. City of Syracuse*, No. 16-cv-634 (FJS/TWD), 2019 WL 1410348, at *4 (N.D.N.Y. Mar. 28, 2019) (citation omitted).

#### 1. Trooper Buck

Defendants argue that Trooper Buck is entitled to summary judgment on Plaintiff's failure to intervene claim premised on an officer pressing a knee into his back because Plaintiff "cannot set forth any admissible evidence" supporting the claim's elements and because Trooper Buck is entitled to qualified immunity. Dkt. No. 72-2 at 27-29. Although Trooper Buck denies observing any force used on Plaintiff "other than observing Trooper Giannettino handcuffing" him, Dkt. No. 72-12 ¶ 18, it is undisputed that Trooper Buck was in close proximity to Plaintiff when he was taken into custody and shortly thereafter. Viewing the evidence in the light most favorable to Plaintiff, therefore, the Court concludes there is a triable issue of fact as to whether Trooper Buck observed force being used on Plaintiff's back after he was restrained and whether he had a reasonable opportunity to intervene and prevent the harm. *See, e.g.*, *Newkirk v. County of Suffolk*, No. 17-cv-2960, 2022 WL 824137, at *5 (E.D.N.Y. Mar. 18, 2022) (denying summary judgment on failure to intervene claim where there were "conflicting accounts rais[ing] genuine disputes of material fact" as to the defendant officer's knowledge and collecting cases); *Snead v. City of New York*, 463 F. Supp. 3d 386, 400 (S.D.N.Y. 2020) (denying summary judgment on failure to intervene claim where the defendant officers testified to being "mere feet away" from the plaintiff when he was arrested and did not present "undisputed evidence such that *no* reasonable jury could conclude that [they] had a realistic opportunity to intervene in [the] alleged constitutional violations"); *see also* *Figueroa v. Mazza*, 825 F.3d 89, 108 (2d Cir. 2016) (concluding that failure to intervene claims, "even assuming that the assault lasted less than twenty seconds," were for the jury to decide).

***10** Moreover, Defendants' qualified immunity argument does not take into account Plaintiff's version of events—that an officer had a knee on his back exerting pressure for up to minutes after he was handcuffed. They therefore have not demonstrated that Trooper Buck is entitled to qualified immunity at this stage.

Accordingly, Trooper Buck is not entitled to summary judgment on Plaintiff's failure to intervene claim.

### 2. Trooper Giannettino

Defendants argue that Trooper Giannettino is entitled to summary judgment on Plaintiff's failure to intervene claim because there is no evidence that Trooper Giannettino knew that any excessive use of force via K-9 Rylo was going to be, or was being committed; that he had a reasonable opportunity to intervene; or that he did not take reasonable steps to intervene. Dkt. No. 72-2 at 29-30. Defendants also argue that Trooper Giannettino is entitled to qualified immunity. Defendants' argument does not account for Plaintiff's version of events and the material factual disputes identified by the Court in connection with the excessive force claim against Trooper Buck. *See supra* Section III.B.1.

To the extent Trooper Giannettino argues that he could not have intervened in the K-9 use of force because he was not K-9 Rylo's handler, the Court rejects that argument. The district court in *Nuzzo* rejected a similar argument that the defendants "had no legal authority to second-guess the dog handlers' decisions about when and how to deploy their dogs." 494 F. Supp. 3d at 238. There is "no 'act of dog' exception" to an officer's duty to intervene if other officers use excessive force: the "rules are no different because the police decide to use a dog rather than another means of force." *Id.*; *see also Maye v. Vargas*, 638 F. Supp. 2d 256, 264 (D. Conn. 2009) (denying summary judgment on failure to intervene in excessive force by way of police dog bites to non-handlers who "were in the vicinity of the attack" and had a realistic opportunity to intervene). Trooper Giannettino does not explain, for example, why a reasonable intervention could not take the form of entreating Trooper Buck to disengage K-9 Rylo once Plaintiff was secured.

In *Mendoza v. McLean*, No. 14-cv-3231, 2016 WL 3542465, at *4-5 (S.D.N.Y. June 23, 2016), the district court denied summary judgment to an officer on a failure to intervene claim where there was evidence that the officer was "nearby when the dog bit plaintiff" and the dog was "ordered to attack plaintiff when he was not resisting arrest." *Id.* There was also evidence suggesting that the incident involving the police dog lasted "long enough for another police officer to have intervened." *Id.* (noting that the canine handler testified that the struggle between the plaintiff and the police dog lasted a "minute or 2"). Here, Plaintiff not only testified that K-9 Rylo continued to bite his leg for multiple minutes after he was handcuffed, but he also testified that he heard an officer from the Cayuga County Sheriff's Office saying "get the dog off him." Dkt. No. 72-5 at 82, 84, 85. A reasonable jury could conclude from this evidence that Trooper Giannettino, who was in the immediate vicinity, had a realistic opportunity to intervene in Trooper Buck's alleged excessive force.

Furthermore, given the factual disputes identified, Trooper Giannettino's cursory argument does not demonstrate his entitlement to qualified immunity at this stage. Accordingly, Trooper Giannettino is not entitled to summary judgment on Plaintiff's failure to intervene claim.

## IV. CONCLUSION

***11** For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment, Dkt. No. 72, is **DENIED**; and it is further

**ORDERED** that the Clerk shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2026 WL 2350153

## Footnotes

1 These facts are drawn from Defendants' Statement of Material Facts Not in Dispute pursuant to Local Rule 56.1, Dkt. No. 72-3, to the extent those facts are well-supported by pinpoint citations to the record, and

the exhibits the parties have submitted. Disputed facts are noted. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

2 Defendants' statement of material facts contains more detailed information about Plaintiff and Ms. Earl's drug use and altercation on February 24, 2021. There is no record evidence to suggest, however, that Defendants were made aware of this information before Plaintiff's arrest. The information therefore necessarily could not have influenced the perspective of a reasonable officer on the scene and is not material to Plaintiff's claims of excessive force and failure to intervene.

3 Plaintiff asserts that he “fell straight down” and “never rolled over” onto K-9 Rylo. Dkt. No. 72-5 at 74.

4 Much of Plaintiff's opposition takes issue with the photos he did (or did not) receive from Defendants and references a photograph of his leg that he claims was taken without permission while he was in the hospital and sent to his ex-wife. *See generally* Dkt. No. 79. To the extent Plaintiff challenges Defendants' compliance with their discovery obligations, the time for him to raise the issue has long since passed. In any event, the existence of a photograph taken of Plaintiff after the incident is not material to the legal issues before the Court on this motion.

5 Defendants argue in reply that Plaintiff does not address the discrepancy between his deposition testimony and his complaint, in which he alleges: “When the K-9 reached the plaintiff, the plaintiff stopped because he did not want to get bit.” Dkt. No. 1 at 2; *see* Dkt. No. 84 at 8. But the Court must view all the evidence in the light most favorable to Plaintiff, including his more specific deposition testimony.

6 *McKinney v. City of Middletown*, 49 F.4th 730 (2d Cir. 2022), is not to the contrary. There, the Second Circuit held that the defendant officers were entitled to qualified immunity because the plaintiff had “not shown that police officers violate clearly established law by allowing a canine bite to continue until a previously violent suspect can be secured.” *Id.* at 741-42 (“McKinney has not shown that it is a violation of clearly established law for the police to ensure that a violent suspect has been secured before *withdrawing* the significant force required to subdue the suspect.”). Here, Plaintiff's testimony is that K-9 Rylo continued biting him for minutes after he was already handcuffed and secured.

7 That there is evidence from which a reasonable jury could conclude that Trooper Giannettino used force gratuitously on Plaintiff after handcuffing distinguishes this case from many of the cases Defendants cite. To the extent any of these cases state or suggest that a *de minimis* injury, in and of itself, warrants summary judgment on an excessive force claim, the Court respectfully disagrees for the reasons already stated. Furthermore, Defendants' argument that Plaintiff's medical records contradict his allegation of sustaining a bruise, Dkt. No. 72-2 at 24, is not persuasive. The “medical records” Defendants cite are in reality two NYSP “Medical Services Deposition” forms. Dkt. No. 72-11 at 10-11.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5175570
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Eric ROGERS, Plaintiff,
v.
Superindent D. ARTUS, Sergeant J. Kruger, Officer A. Blanar, Officer J. Myers, Officer T. McCann, Officer G. Barlow, Officer Bobo, Officer Michienzi and Nurse R. McKinay, Defendants.

No. 13–CV–21M.
|
Sept. 11, 2013.

**Attorneys and Law Firms**

Eric Rogers, Pine City, NY, pro se.

ORDER

JOHN T. CURTIN, District Judge.

***INTRODUCTION***

***1** Plaintiff Eric Rogers, an inmate of the Southport Correctional Facility, has filed this *pro se* action seeking relief under 42 U.S.C. § 1983 (Docket No. 1) and has both requested permission to proceed *in forma pauperis* and has filed a signed Authorization (Docket No. 2). Plaintiff has also moved for the appointment of counsel. (Docket No. 3). The complaint sets forth claims relating to assaults that plaintiff allegedly suffered at the hands of several of the defendants in March, 2012 during his previous incarceration at the Wende Correctional Facility ("Wende"). For the reasons set forth below, plaintiff's request to proceed as a poor person is granted, his claims against one of the defendants are dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, and service by the U.S. Marshals is ordered with respect to the remaining claims.

***STANDARD OF REVIEW***

Because plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization with respect to this action, plaintiff is granted permission to proceed *in forma pauperis.* Section 1915(e)(2)(B) of 28 U.S.C. provides that the Court shall dismiss a case in which *in forma pauperis* status has been granted if the Court determines that the action (i) is frivolous or malicious; (ii) fails to state a claim upon which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. In addition, 28 U.S.C. § 1915A(a) requires the Court to conduct an initial screening of "a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," *id.,* regardless of whether or not the inmate has sought *in forma pauperis* status under 28 U.S.C. § 1915.

In evaluating the complaint, the Court must accept as true all of the factual allegations and must draw all inferences in plaintiff's favor. *See Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir.2003) (per curiam); *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). Moreover, "a court is obliged to construe [*pro se* ] pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004); *and see Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). Nevertheless, even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004). "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)) (internal quotation marks and citation omitted); *see also Boykin v. Keycorp,* 521 F.3d 202, 213 (2d Cir.2008) (discussing pleading standard in *pro se* cases after *Twombly;* "even after *Twombly,* dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). "A document filed *pro se* is to be liberally construed ..., and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson,* 551 U.S. at 94, 127 S.Ct. at 2200, 167 L.Ed.2d 1081 (internal quotation marks and citations omitted). Generally, the Court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal " 'unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.' " *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007) (quoting *Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999) (*per curiam* )).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

## *DISCUSSION*

***2** Plaintiff's claims all relate to several assaults that plaintiff claims to have sustained at Wende on March 22, 2012. At around 3 p.m. on that date, plaintiff states that he was confronted by defendants Sergeant J. Kruger, and Officers Blanar and McCann, who frisked him and surrounded him. As described in the complaint, the altercation that led to the initial assault by defendant Officer T. McCann was precipitated by Sergeant Kruger's apparent belief that plaintiff had filed a grievance alleging that he had taken plaintiff's television. As plaintiff attempted to explain to Kruger, in response to Kruger's objection to having been grieved by plaintiff, that the grievance was in reference to another incident, McCann allegedly punched plaintiff in the face. Plaintiff further alleges that Kruger then in essence interceded to stop the assault, and later apologized for McCann's actions, and promised to obtain a TV for him. (Complaint, ¶¶ 7–22).

Plaintiff next alleges that several hours later on the same date (around 7 p.m.), while returning to his cell, defendant McCann hit him again, and after he was on the ground and handcuffed defendant Officers McCann, Myers and Blanar, as well as defendant Kruger, "beat him over the head, back and legs with batons, boots and fists." (Complaint, ¶ 24). Subsequently, after Kruger told plaintiff he would send him to the hospital, he punched him several more times. (Complaint, ¶ 25).

Plaintiff was then taken to the facility clinic and while there claims he was again assaulted by a group of officers which included defendants Kruger and McCann. Plaintiff alleges that he recognized in the room defendant Officers Bobo and Michienzi, but isn't sure if they participated in the beatings; plaintiff asserts, however, that he knows "they did nothing to intervene and stop [the] beatings." (Complaint, ¶ 26).

Plaintiff next alleges that when he was finally brought into an examination from, defendant Nurse McKinay told him to let him know when his head injury hurt and started pressing down on the injury, continuing to press even harder when plaintiff told him it hurt (Complaint, ¶ 27); the allegation or inference is that defendant McKinay was attempting to exacerbate plaintiff's pain rather than diagnose or treat him. While this was going on, plaintiff alleges that defendant Michienzi was pulling his handcuffs behind plaintiff's back until he was leaning over his knees as another officer attempted to knee him in the face. (*Id.*).

Plaintiff further alleges that after being beaten again, defendant Kruger threatened to retaliate against him if he told anyone from Erie County Medical Center what had happened, and later fabricated a misbehavior report alleging that plaintiff had assaulted the defendants. (Complaint, ¶ 29). As a result of the allegedly fabricated assault charge, plaintiff was criminally charged with assault, but the charges were dismissed by an Erie County Grand Jury. (Complaint, ¶ 31). Plaintiff claims that as result of the alleged assaults, he suffered a head injury requiring staples, and that he sustained a variety of other injuries resulting in migraines, pain and dizziness. (Complaint, ¶ 30).

***3** Plaintiff's allegations are sufficient to allow Eighth Amendment excessive force claims to go forward against defendants Kruger, McCann, Blanar, Myers, Barlow and Micienzi. The allegation that defendant McKinay pressed down on the head injury plaintiff sustained in one of the beatings is likewise sufficient, albeit barely, to allow an Eighth Amendment claim against him to go forward.

While plaintiff does not allege that defendant Officer Bobo participated in the beatings (he states "I'm not sure"), his allegation that Bobo was in the room during one of the assaults but did nothing to intervene and stop the beatings is sufficient to state an Eighth Amendment failure to protect claim against Bobo, which may go forward against juncture. *See, e.g., D'Attore v. Cucharella,* 2012 U.S. Dist. LEXIS 167359, at *22–24 (N.D.N.Y. Oct. 3, 2012 (declining to dismiss failure to protect claim against corrections officer who made no effort to intervene and prevent fellow corrections officer from punching plaintiff a second time). (Complaint, ¶ 26). Plaintiff likewise states a failure to protect claim against defendant Michienzi, who is also alleged to have been present during the same assault on him, and, like defendant Bobo, done nothing to stop it.

Plaintiff's allegations also state a First Amendment retaliation claim against defendant Kruger to the extent that he alleges, as noted above, that Kruger fabricated a misbehavior report against him in an attempt to cover up the defendants' misconduct in beating plaintiff up because he had filed grievances.

The complaint fails to state a claim against defendant Superintendent Artus. Plaintiff alleges only that he wrote to Artus a letter complaining that facility officers had abused their authority and were harassing him. (Complaint, ¶ 16).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Attached to the complaint are several grievances by plaintiff in which he complained of, e.g., harassment by officers, the taking of his TV and the assaults at the hands of the defendants described above. (Docket No. 1 [Exhibits to Complaint], pp. 15, 19–22). Also attached are two Inmate Grievance Program decisions by Artus rejecting his grievances, including the grievance filed wiith respect to the alleged assaults (*Id.* pp. 13, 24). It is well-established that "personal involvement ... in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation omitted). The denial, or affirmance of a denial, of a grievance by a Superintendent or other supervisory official is insufficient, without more, to create personal involvement in alleged violations:

> Plaintiff attempts to establish personal involvement by Superintendent Poole and CORC Director Eagan by pointing to their roles in reviewing Plaintiffs grievances. Without more, this is insufficient to create personal involvement in Plaintiff's alleged constitutional violations.
>
> Invariably, a prisoner's grievance is passed upon by the Superintendent, and by the director of the CORC if the prisoner pursues a further appeal. *See* N.Y. Comp.Code R. & Regs., tit. 7, § 701.7(c) ("Th[e] [Inmate Grievance] [P]rogram enables any inmate who is personally affected by an issue for which there is no avenue for redress or correction to seek resolution of a complaint through a facility committee of elected peers and appointed staff members: the inmate grievance resolution committee (IGRC). If not satisfied, an inmate may appeal to the facility superintendent; if still not satisfied, an inmate may appeal to a committee of central office staff acting on behalf of the commissioner: the central office review committee (CORC)."). This is insufficient, however, to establish the requisite personal involvement for purposes of § 1983. *See Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) ("The fact that Superintendent Greiner affirmed the denial of plaintiff's grievance-which is all that is alleged against him-is insufficient to establish personal involvement or to shed any light on the critical issue of supervisory liability, and more particularly, knowledge on the part of the defendant.")

***4** *James v. Poole,* 2013 U.S. Dist. LEXIS 3440, at *18–19, 2013 WL 132492 (W.D.N.Y. Jan. 9, 2013). Accordingly, plaintiff's claim against defendant Superintendent Artus must be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.

### *MOTION FOR APPOINTMENT OF COUNSEL*

Plaintiff has moved for the appointment of counsel. (Docket No. 3). Plaintiff's application is premature as a more fully developed record will be necessary before the Court can determine whether plaintiff's chances of success warrant the appointment of counsel. Therefore, plaintiff's motion is denied without prejudice to its renewal at such time as the existence of a potentially meritorious claim may be demonstrated. *See Hendricks v. Coughlin,* 114 F.3d 390, 392 (2d Cir.1997) (when determining whether to appoint counsel, the Court must first look to the "likelihood of merit" of the underlying dispute).

### *CONCLUSION*

Because plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization with respect to the filing fee, his request to proceed *in forma pauperis* is hereby granted. Plaintiffs motion for the appointment of counsel is denied without prejudice as premature. For the reasons discussed above, plaintiff's claim against defendant Superintendent Artus is dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B) (ii) and 1915A, and the U.S. Marshal is directed to serve the summons and complaint on defendants Sergeant J. Kruger, Officers A. Blanar, J. Myers, T. McCann, G. Barlow, Bobo, Michienzi, and Nurse R. McKinay regarding the remaining claims.

### *ORDER*

IT HEREBY IS ORDERED, that plaintiffs request to proceed *in forma pauperis* is granted;

FURTHER, that plaintiff's motion to appoint counsel is denied without prejudice;

FURTHER, that the claim against Superintendent D. Artus is dismissed with prejudice;

FURTHER, that the Clerk of the Court is directed to terminate defendant D. Artus as a party to this action;

FURTHER, that the Clerk of the Court is directed to file plaintiffs papers, and to cause the United States Marshal to serve copies of the Summons, Complaint, and this Order upon

J. Kruger, A. Blanar, J. Myers, T. McCann, G. Barlow, Bobo, Michienzi and McKinay without plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in plaintiffs favor; [1]

FURTHER, the Clerk of the Court is directed to forward a copy of this Order by email to Michael Russo, Assistant Attorney General in Charge, Buffalo Regional Office <Michael.Russo@ag.ny.gov>;

FURTHER, that pursuant to 42 U.S.C. § 1997e(g)(2), the defendants are directed to respond to the complaint.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5175570

## Footnotes

1 Pursuant to a Standing Order of Court, filed September 28, 2012, a defendant will have 60 days to file and serve an answer or other responsive pleading, *see* Fed.R.Civ.P. 12(a)-(b), if the defendant and/or the defendant's agent has returned an Acknowledgment of Receipt of Service by Mail Form within 30 days of receipt of the summons and complaint by mail pursuant to N.Y.C.P.L.R. § 312–a.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3672105
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,
v.
Ena Paola GENSINI; Gunilla De Montaigu;
and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).
|
Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq., Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel, Syracuse, NY, for Defendants Gunilla De Montaigu and Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

***MEMORANDUM DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

***1** Currently pending before the Court in the above-captioned action is a motion by Defendants containing two alternative requests for relief: (1) a request for reconsideration of Part III.D.5 of the Court's Decision and Order of May 5, 2009, denying Defendants' request for dismissal of all of Plaintiffs' claims due to the doctrine of *forum non conveniens;* and (2) a request for dismissal of the First Cause of Action of Plaintiffs' Third Amended Complaint (asserting a claim of violation of Panama law) as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code. (Dkt. No. 61.) For the reasons set forth below, Defendants' motion is granted in part, and denied in part.

**I. REQUEST FOR RECONSIDERATION**

To the extent that Defendants' motion requests reconsideration of the Court's decision to denying their request for dismissal of all of Plaintiffs' claims due to the doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No. 61.) The Order of which reconsideration was sought was entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y. L.R. 7.1(g) (setting ten-day deadline for motions for reconsideration). Defendants' attempt to characterize the Order of which reconsideration is sought as being the Court's Text Order of May 29, 2009, is unconvincing. That Text Order merely indicates the extent to which Plaintiffs' signed Third Amended Complaint fails to comport with the Court's Decision and Order of May 5, 2009 (and was issued in response to Plaintiffs' request for guidance). Even liberally construed, Defendants' motion for reconsideration expressly and repeatedly challenges the substance of the Court's Order of May 5, 2009 (specifically, Part III.D.5. thereof), and only that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61, Part 4, Points II and III.)

In any event, even if the Court were to consider the merits of Defendants' motion for reconsideration, the Court would deny that motion as without cause: there has been no intervening change of controlling law, no previously unavailable evidence, and there exists no clear error of law or manifest injustice with regard to the relevant portion of the prior decision in question.

For these reasons, Defendants' request for reconsideration is denied.

**II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF ACTION**

To the extent that Defendants' motion alternatively requests the dismissal of the First Cause of Action of Plaintiffs' Third Amended Complaint (asserting a claim of violation of Panama law) as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response papers, to oppose this request. (*See* Dkt. No. 63.) The closest that Plaintiffs come to opposing this request is when, in a supplemental letter request, they (correctly) point out that Defendants have improperly broadened the target of their Panamanian-statute-of-limitations argument from Plaintiffs' First Cause of Action to all of Plaintiffs' causes of action. (Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a result of Plaintiffs' failure to address Defendants' argument

regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

***2** After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also Rusyniak v. Gensini,* 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is ***GRANTED* in part,** and ***DENIED* in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is ***DENIED,*** however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is ***DISMISSED*** as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

## Footnotes

1 *See Cossey v. David,* 04–CV–1501, 2007 WL 3171819, at *7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy “their modest burden of demonstrating entitlement to the relief requested through that argument”); *Saunders v. Ricks,* 03–CV–598, 2006 WL 3051792, at *9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) (“By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment.”); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at *27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1765558
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kyle WILLIAMS and Rachel Chrysler, Plaintiffs,
v.
Police Officer Gregory DIPUCCIO
and Police Officer Liadka, Defendants.

5:19-cv-995 (BKS/MJK)
|
Signed April 24, 2024

**Attorneys and Law Firms**

For Plaintiffs: Fred Lichtmacher, The Law Office of Fred Lichtmacher P.C., 116 West 23rd Street, Suite 500, New York, New York 10011.

For Defendants: Susan R. Katzoff, Corporation Counsel of the City of Syracuse, Danielle B. Pires, First Assistant Senior Corporation Counsel, Darienn P. Balin, Assistant Corporation Counsel, 300 City Hall, Syracuse, New York 13202.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

## I. INTRODUCTION

***1** Plaintiffs Kyle Williams and Rachel Chrysler bring this action against Defendants Police Officer Gregory DiPuccio and Police Officer Liadka pursuant to 42 U.S.C. § 1983. (Dkt. No. 15). Over the course of litigation, some of Plaintiffs' claims were dismissed. *See Williams v. City of Syracuse*, No. 19-cv-995, 2020 WL 6504630, *3, 2020 U.S. Dist. LEXIS 206929 (N.D.N.Y. Nov. 5, 2020) (dismissing *Monell*, malicious prosecution, and fair trial claims). Remaining are Plaintiffs' claims for excessive force and failure to intervene in violation of Plaintiffs' constitutional rights under the Fourth Amendment. (Dkt. No. 15, ¶¶ 22–32); *Williams*, 2020 WL 6504630, at *3, 2020 U.S. Dist. LEXIS 206929. Presently before the Court is Defendants' motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 66). Plaintiffs have filed an opposition memorandum, (Dkt. No. 69), to which Defendants filed a reply, (Dkt. No. 70). The Court heard oral argument on the motion on April 19, 2024. (Text Minute Entry dated Apr. 19, 2024). For the reasons that follow, Defendants' motion for partial summary judgment is granted in part and denied in part.

## II. FACTS [1]

On September 9, 2016, Plaintiffs were at the Half Penny Pub, and an argument ensued after they were asked to leave by the Half Penny Pub's manager. (Dkt. No. 66-16, ¶¶ 1–2; Dkt. No. 69-2, ¶¶ 1–2). As a result of the argument, "911 was called and the police showed up shortly after [Plaintiffs] left." (Dkt. No. 66-16, ¶ 9; Dkt. No. 69-2, ¶ 9). At approximately 10:30 p.m., Defendant DiPuccio and a City of Syracuse police officer responded to the call, and Half Penny Pub employees provided them with a summary of the incident and a description of the individuals involved. (Dkt. No. 66-16, ¶¶ 10–15; Dkt. No. 69-2, ¶¶ 10–15). Defendant DiPuccio and the other officer left, and Plaintiffs returned to the Half Penny Pub. (Dkt. No. 66-16, ¶ 16; Dkt. No. 69-2, ¶ 16). A bouncer employed by the Half Penny Pub called 911 again, prompting the dispatch of Defendants DiPuccio and Liadka to the Half Penny Pub. (Dkt. No. 66-16, ¶¶ 17–18; Dkt. No. 69-2, ¶¶ 17–18). Upon arrival, Defendants were informed by the bouncer that the "suspects [from the earlier incident] were kicking the door to the bar and that they had just left, cutting through a parking lot." (Dkt. No. 66-16, ¶ 19; Dkt. No. 69-2, ¶ 19). The bouncer provided Defendants with a description of the two suspects, and Defendants "left the Half Penny Pub on E. Fayette and circled around the block to the 200 block of Walton Street." (Dkt. No. 66-16, ¶¶ 20–21; Dkt. No. 69-2, ¶¶ 20–21). Defendants "went to the bridge area in the 200 block of Walton Street and observed two people matching the description provided by [the bouncer]." (Dkt. No. 66-16, ¶ 22; Dkt. No. 69-2, ¶ 22). Defendants then approached Plaintiffs. (Dkt. No. 66-16, ¶ 23; Dkt. No. 69-2, ¶ 23).

***2** The parties dispute whether, after Defendants approached Plaintiffs, Plaintiff Williams swung his arms, striking the Defendants in their chest areas. (Dkt. No. 66-16, ¶ 31; Dkt. No. 69-2, ¶ 31). The parties also dispute whether Plaintiff Williams resisted Defendants' subsequent attempt to arrest him. (Dkt. No. 66-16, ¶ 33; Dkt. No. 69-2, ¶ 33). It is undisputed that Defendants forced Plaintiff Williams's body to the ground, and as he was going to the ground his face struck concrete. (Dkt. No. 66-16, ¶ 36; Dkt. No. 69-2, ¶ 36). It is also undisputed that Defendant DiPuccio was positioned on the lower half of Plaintiff Williams's body and Defendant Liadka was on the upper half. (Dkt. No. 66-16, ¶ 42; Dkt. No. 69-2, ¶ 42). Defendants assert that they used a limited amount of force while Williams was resisting arrest, and that they

were able to get him under control in about two minutes. (Dkt. No. 66-16, ¶¶ 45–60, 66). Defendant Liadka testified that he "administered three knee strikes" to Plaintiff Williams's right side and struck Plaintiff Williams "three times in the face with a closed fist" while Plaintiff Williams was resisting Defendants' attempt to arrest him. (Dkt. No. 66-16, ¶¶ 45, 56; Dkt. No 66-6, at 86–87; Dkt. No. 66-9, at 43–44; Dkt. No. 66-11, ¶¶ 4–5). Defendant DiPuccio testified that he struck Williams "three times in the torso area to control [his] left hand." (Dkt. No. 66-16, ¶ 51; Dkt. No. 66-6, at 16; Dkt. No. 66-7, at 5; Dkt. No. 66-10, ¶ 5). Plaintiff Williams, on the other hand, testified that he was not resisting arrest and that he was beaten by Defendants for twenty minutes. (Dkt. No. 69-2, ¶¶ 39–52; Dkt. No. 66-12, at 19–20, 23).

The parties similarly dispute whether, after Plaintiff Williams was handcuffed, Plaintiff Chrysler resisted arrest and became combative. (Dkt. No. 66-16, ¶¶ 69–72; Dkt. No. 69-2, ¶¶ 69–72). It is not disputed that Defendant DiPuccio took Plaintiff Chrysler to the ground by kicking her legs out from underneath her, but it is disputed whether Plaintiff Chrysler was handcuffed at that time. (Dkt. No. 66-16, ¶ 73; Dkt. No. 69-2, ¶ 73). Defendant DiPuccio testified that Plaintiff Chrysler was noncompliant, that his arrest of Plaintiff Chrysler took approximately forty-five seconds, and that Defendant Liadka did not assist in the arrest of Plaintiff Chrysler and was "occupied with trying to keep [Plaintiff] Williams under control." (Dkt. No. 66-10, ¶¶ 13–16). Defendant Liadka testified that he did not observe Defendant DiPuccio take Plaintiff Chrysler to the ground, he did not assist in arresting Plaintiff Chrysler, and his "attention remained on [Plaintiff Williams] while [Defendant] DiPuccio went to arrest [Plaintiff] Chrysler." (Dkt. No. 66-11, ¶¶ 11–13). But Plaintiff Chrysler testified that she was not struggling or trying to get away from Defendant DiPuccio and that "she had like four officers with knees in [her] back," including "a blond woman," Defendant DiPuccio, and other officers Plaintiff Chrysler could not see. (Dkt. No. 66-20, at 18). Plaintiff Chrysler testified that the officers' knees were on her "back[,] ... back of [her] stomach, back of [her] shoulders" and that she had "head pain." (*Id.*).

Eventually, Plaintiffs were transported to Upstate University Hospital via ambulance. (Dkt. No. 66-16, ¶ 90; Dkt. No. 69-2, ¶ 90). Defendant Liadka rode in the ambulance with Plaintiffs. (Dkt. No. 66-16, ¶¶ 91, 99; Dkt. No. 69-2, ¶¶ 91, 99). Defendant DiPuccio was not present in the ambulance. (Dkt. No. 66-16, ¶¶ 92, 98; Dkt. No. 69-2, ¶¶ 92, 98).

## III. STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, the entry of summary judgment is warranted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

***3** "If the moving party carries its burden, the nonmoving party must come forward with evidence that would be sufficient to support a jury verdict in its favor." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted). Rather than "deny[ing] the moving party's allegations in a general way, the party opposing summary judgment must present competent evidence that creates a genuine issue of material fact." *Id.* (citation omitted). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

## IV. DISCUSSION

Defendants move for summary judgment as to Plaintiffs' failure to intervene claims arising from Defendants' alleged uses of excessive force during Plaintiffs' arrests and as to any claim against Defendant DiPuccio arising from actions taken in the ambulance during transportation of Plaintiffs to Upstate University Hospital. (Dkt. No. 66-17, at 7–15). With respect to the failure to intervene claims, Defendants argue: (1) that they were both direct participants in the alleged excessive force used during Plaintiffs' arrests, and they therefore cannot be liable for failure to intervene, and (2) that the circumstances of Plaintiffs' arrests did not provide

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Defendants' an opportunity to intervene, (Dkt. No. 66-17, at 10–15).

**A. Direct Participation**

According to Defendants, they "were direct participants in the alleged excessive force during [Plaintiff] Williams' arrest[,]" and thus, Plaintiff Williams may not separately claim Defendants failed to intervene. (Dkt. No. 66-17, at 11–12). Plaintiffs respond by asserting that courts have permitted excessive force and failure intervene claims to proceed in the alternative beyond summary judgment. (Dkt. No. 69, at 3–6).

It is widely recognized that "[a] police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it." *Lennox v. Miller*, 968 F.3d 150, 158 (2d Cir. 2020) (quoting *Figueroa*, 825 F.3d at 106). To establish a claim for failure to intervene, a plaintiff must show that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Franco v. City of Syracuse*, No. 16-cv-634, 2019 WL 1410348, at *3, 2019 U.S. Dist. LEXIS 52675 (N.D.N.Y. Mar. 28, 2019) (citation and internal quotation marks omitted). "When a law enforcement officer 'is a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is inapplicable.' " *Buchy v. City of White Plains*, No. 14-cv-1806, 2015 WL 8207492, at *3, 2015 U.S. Dist. LEXIS 163469 (S.D.N.Y. Dec. 7, 2015); *Cornell v. Village of Clayton*, No. 20-cv-1283, 2023 WL 5965431, at *8, 2023 U.S. Dist. LEXIS 162919 (N.D.N.Y. Sept. 13, 2023). A plaintiff "may, however, hold [defendant police officers] liable for one or the other." *Buchy*, 2015 WL 8207492, at *3, 2015 U.S. Dist. LEXIS 163469. Therefore, "district courts have allowed excessive force and failure to intervene claims to proceed in the alternative beyond the summary judgment stage." *Franco*, 2019 WL 1410348, at *4, 2019 U.S. Dist. LEXIS 52675. Federal Rule of Civil Procedure 8(d) supports this outcome by recognizing that claims may be brought in the alternative, even if they are inconsistent. *See* Fed. R. Civ. P. 8(d)(2), (3).

***4** Here, as in other cases, a jury is "free to believe all, some or none of a plaintiff's testimony," *Buchy*, 2015 WL 8207492, at *3, 2015 U.S. Dist. LEXIS 163469, and determine whether "the Officers either used excessive force, or one [ ] of them failed to intervene while another officer used excessive force," *Cumberbatch v. Port Auth. Of N.Y. & N.J.*, No. 03-cv-749, 2006 WL 3543670, at *11, 2006 U.S. Dist. LEXIS 88853 (S.D.N.Y. Dec. 5, 2006). There are issues of fact regarding the need for the use of force, the duration of the use of force, and the amount of force actually employed; if there was an excessive use of force, a jury might find that only one of the Defendants' use of force was excessive. *See, e.g.*, *Dorceant v. Aquino*, No. 15-cv-7103, 2017 WL 3575245, at *4, 2017 U.S. Dist. LEXIS 131633 (E.D.N.Y. Aug. 17, 2017) ("While it is true that a defendant cannot be liable for directly participating and for failing to intervene, ... the undisputed facts do not allow me to determine which officers should be liable as direct participants and which as non-intervenors." (citations omitted)). Thus, Defendants' motion for partial summary judgment on this basis is denied.

**B. Opportunity to Intervene**

Defendants next argue that Plaintiffs' failure to intervene claims must be dismissed because "neither of the Defendant Officers had the opportunity to intervene in the other's actions." (Dkt. No. 66-17, at 13). Plaintiffs respond that summary judgment is improper because genuine issues of material fact remain regarding the duration of Plaintiffs' arrests and the force used by Defendants. (Dkt. No. 69, at 5–7).

"Whether an officer failed to intervene to prevent an unlawful use of force is a fact-intensive inquiry[.]" *John v. City of New York*, 406 F. Supp. 3d 240, 246 (E.D.N.Y. 2017). For Plaintiffs to succeed on their failure to intervene claims, "there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Lennox*, 968 F.3d at 158 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless 'considering all the evidence, reasonable jury could not possibly conclude otherwise.' " *Hicks v. Craw*, 405 F. Supp. 3d 374, 385 (N.D.N.Y. 2019) (quoting *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014)). Here, there remain genuine issues of material fact that prevent the granting of summary judgment and dismissal of Plaintiffs' failure to intervene claims.

First, with respect to Plaintiff Williams's arrest, Defendants argue that they "were concentrated on different parts of [Plaintiff] Williams' body and neither observed what the other was doing" and that in any event, the arrest happened so quickly "that neither of the Defendant Officers would have had the time to intervene to stop the other from using force." (Dkt. No. 66-17, at 13–14). Defendants testified

that Plaintiff Williams' arrest took "approximately two minutes." (Dkt. No. 66-10, ¶ 11; Dkt. No. 66-11, ¶ 10). Plaintiff Williams, on the other hand, testified that Defendants beat him on the ground for twenty to thirty minutes. (Dkt. No. 66-21, at 23). Defendants also testified that they were facing away from each another, "back-to-back," unaware of what the other was doing. (Dkt. No. 66-10, ¶¶ 6–8; Dkt. No. 66-11, ¶¶ 7–9). Plaintiff Williams testified, however, that Defendants would have seen each other according to the nature of the arrest, (Dkt. No. 66-21, at 19–20), and Plaintiff Chrysler testified that both Defendants were focused on Plaintiff Williams's upper torso and head while the Half Penny Pub bouncer "held [Plaintiff Williams's] legs down," (Dkt. No. 66-20, at 16). These issues of fact are fit for a jury to decide, as "[a]ssessments of credibility and choices between conflicting versions of the events are [ ] not for the court on summary judgment." *See* *Jeffreys*, 426 F.3d at 553.

***5** Second, regarding Plaintiff Chrysler's arrest, Defendants argue that Defendant Liadka could not be found liable for failure to intervene because his "attention remained with [Plaintiff Williams]" as Plaintiff Williams "kick[ed] and thrash[ed] on the ground after being handcuffed[.]" (Dkt. No. 66-17, at 14; *see also* Dkt. No. 66-11, ¶ 11). According to Defendants, when Defendant DiPuccio left Plaintiff Williams and "moved approximately five feet away and told [Plaintiff] Chrysler that she was under arrest," Defendant Liadka "did not assist in [Plaintiff] Chrysler's arrest and did not observe [Defendant] DiPuccio take her to the ground." (Dkt. No. 66-17, at 14; *see also* Dkt. No. 66-10, ¶¶ 12, 15, 17; Dkt. No. 66-11, ¶¶ 11, 13). But the dispute as to what happened once Plaintiff Chrysler was on the ground creates genuine issues of material fact.

Defendant DiPuccio testified that "[Plaintiff] Chrysler's arrest took approximately [forty-five] seconds[,]" (Dkt. Nos. 66-10, ¶ 16). But Plaintiff Chrysler testified that "she had like four officers with knees in [her] back," including "a blond woman," Defendant DiPuccio, and other officers Plaintiff Chrysler could not see. (Dkt. No. 66-20, at 18). Plaintiff Chrysler testified that their knees were on her "back[,] ... back of [her] stomach, [and] back of [her] shoulders." (*Id.*). And contrary to Defendants' portrayal of the arrest, Plaintiff Chrysler testified that she was not struggling, resisting, or otherwise trying to get away. (*Id.*). Plaintiff Chrysler described the officers with knees on her back as "going from [Plaintiff Chrysler] to [Plaintiff Williams] holding [them] down." (*Id.*).

"Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Cornell*, 2023 WL 5965431, at *8, 2023 U.S. Dist. LEXIS 162919 (quoting *Branen*, 17 F.3d at 557). Here, a jury could credit Plaintiffs' testimony that neither of them were kicking or thrashing against Defendants during the arrests, (Dkt. No. 66-20, at 15; Dkt. No. 66-21, at 19–20), which would undermine Defendant Liadka's testimony that his "attention remained on" Plaintiff Williams" while Defendant DiPuccio arrested Plaintiff Chrysler because Plaintiff Williams was "kicking and thrashing," (Dkt. No. 66-11, ¶ 11). The Second Circuit has explained that there is no "bright-line rule" for how much time must lapse before a failure to intervene claim may arise. *Figueroa*, 825 F.3d at 107. Thus, a jury would be free to weigh Defendant DiPuccio's testimony that Plaintiff Chrysler's arrest "took approximately [forty-five] seconds[,]" (Dkt. Nos. 66-10, ¶ 16), and Defendant Liadka's testimony that he did not assist in arresting Plaintiff Chrysler and his "attention remained on [Plaintiff Williams] while [Defendant] DiPuccio went to arrest [Plaintiff] Chrysler," (Dkt. No. 66-11, ¶¶ 11–13), against Plaintiff Chrysler's testimony that Defendant DiPuccio "had his knees in [her] back" and that subsequently, "four officers [had their] knees in [her] back" and were "going from [Plaintiff Chrysler] to [Plaintiff Williams] holding [them] down," (Dkt. No. 66-20, at 18), alongside any other factors, including "the number of officers present, their relative placement, the environment in which they acted, [and] the nature of the assault," *Johnson v. N.Y. State Police*, 659 F. Supp. 3d 237, 251 (N.D.N.Y. 2023) (quoting *Figueroa*, 825 F.3d at 107), to determine whether either Defendant failed to intervene during the arrest of Plaintiff Chrysler.

Because there are genuine issues of material fact, Defendants' motion for partial summary judgment is denied with respect to Plaintiffs' failure to intervene claims during Defendants' arrests of Plaintiffs.

### C. Failure to Intervene in Alleged Excessive Force Used Inside Ambulance

***6** Lastly, Defendants argue that "it would have been impossible for [Defendant] DiPuccio to have had any personal involvement in the events that occurred inside of the ambulance, including intervening in any alleged force that [Defendant] Liadka used while in the ambulance." (Dkt. No. 66-17, at 15). Plaintiffs admit that "[Defendant] DiPuccio was not present in the ambulance[ ]" that transported Plaintiffs to

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Upstate University Hospital, and "[Defendant] DiPuccio was not aware of any force allegedly used by [Defendant] Liadka in the ambulance. (Dkt. No. 66-16, ¶¶ 92, 98, 100; Dkt. No. 69-2, ¶¶ 92, 98, 100).

At oral argument, the parties agreed that Defendant DiPuccio had no involvement in any use of force in the ambulance during transportation of Plaintiffs to Upstate University Hospital. Accordingly, Defendants' motion for partial summary judgment is granted as to any claims against Defendant DiPuccio arising from actions taken in the ambulance during transportation of Plaintiffs to Upstate University Hospital.

## V. CONCLUSION

For the reasons set forth above, it is hereby

**ORDERED** that Defendants' motion for partial summary judgment, (Dkt. No. 66), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendants' motion for partial summary judgment, (Dkt. No. 66), is **GRANTED** with respect to Plaintiffs' claim of excessive force and failure to intervene against Defendant DiPuccio arising from any actions in the ambulance during transportation of Plaintiffs to Upstate University Hospital, and that claim is **DISMISSED**; and it is further

**ORDERED** that Defendants' motion for partial summary judgment, (Dkt. No. 66), is otherwise **DENIED.**

### All Citations

Not Reported in Fed. Supp., 2024 WL 1765558

## Footnotes

1 The facts are drawn from Defendants' Statement of Material Facts Not in Dispute and Plaintiffs' Response to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, (Dkt. Nos. 66-16, 69-2), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The Court limits its recitation to undisputed facts relevant to disposition of Defendants' motion. The facts are construed in the light most favorable to Plaintiffs as the non-moving parties. *See* *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.